No. 48,726

The Southeast Kansas Landowners Association, *et al., Appellants, v.* The Kansas Turnpike Authority, *Appellee.*

(582 P.2d 1123)

Opinion filed July 15, 1978.

*Robert J. O'Connor,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and was on the brief for the appellants.

*Richard R. Rock,* of Rock, Smith & Wright, of Arkansas City, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Miller, J.: This action was commenced by the plaintiffs, Southeast Kansas Landowners Association, an unincorporated association composed of more than 230 persons owning more than eighty per cent of the land over which proposed toll roads are to be routed, and Kent Radcliff, Phyllis Clayton, and Lynn Swearingen, individually and as representatives of a class of similarly situated persons, to permanently enjoin the defendant, The Kansas Turnpike Authority, from building, and from issuing bonds to fund, the proposed Southeast Kansas Turnpike, which will extend from Winfield, Kansas, to the Baxter Springs-Galena area in southeast Kansas, and the "connector," which would connect the proposed Southeast Kansas Turnpike and the present Kansas Turnpike, extending from Winfield, Kansas, to the area of Belle Plaine, just south of Wichita. The trial court found in favor of the Kansas Turnpike Authority on all issues; plaintiffs appeal.

There are a number of issues, which will be detailed later in this opinion. We turn first to the legislative history and background facts.

## LEGISLATIVE HISTORY

The original Kansas Turnpike statutes were enacted in 1953 (Laws 1953, Chap. 308). These now appear as K.S.A. 68-2001 to 2020, inclusive. Certain studies were statutorily mandated; these were required before the project could be undertaken. Section 2 of the original act, K.S.A. 68-2002, provides:

". . . No toll road project shall be undertaken unless and until such project and the proposed location therefor have been thoroughly studied with respect to traffic, engineering, cost and financing nor unless such study shows: (a) That public funds for construction of a free expressway are not available; (b) that the construction of a toll expressway can be financed wholly through the investment of private funds in toll road revenue bonds; and (c) that the project and indebtedness incurred therefor will be entirely self-liquidating through tolls and other income from operation of the project."

The issuance of Turnpike revenue bonds was authorized. These were made payable solely from revenues by section 8 of the 1953 act, now K.S.A. 68-2008, which provides:

"Revenue bonds issued under the provisions of this act shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision thereof, but all such bonds shall be payable solely from the funds herein provided therefor from revenues. All such revenue bonds shall contain on the face thereof a statement to the effect that neither the state nor the authority shall be obligated to pay the same or the interest thereon except from revenues of the project or projects for which they are issued and that neither the faith and credit nor the taxing power of the state or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds.

"All expenses incurred in carrying out the provisions of this act shall be payable solely from funds provided under the authority of this act and no liability or obligation shall be incurred by the authority hereunder beyond the extent to which moneys shall have been provided under the provisions of this act."

The construction and funding of the 18th Street Expressway, connecting Kansas City, Kansas, and the original Kansas Turnpike, with the urban areas of northeast Johnson County, was authorized by Laws of Kansas, 1957, Chapter 368, since amended and now appearing as K.S.A. 68-2031-2049. The 1957 act required studies similar to those required in the original turnpike act, but additional funds were provided to pay the indebtedness in the event that revenues were not sufficient in any year. Sections 2, 4, and 7 of the 1957 act read in part as follows:

". . . No toll road project shall be undertaken unless and until such project and the proposed location therefor have been thoroughly studied with respect to traffic, engineering, cost and financing nor unless such study shows: That ade-

quate public funds for construction of a free expressway are not available; and that the construction of a toll expressway can be financed wholly through the investment of private funds in toll road revenue bonds issued under the provisions of this act; and that the project and indebtedness incurred therefor will be entirely self-liquidating through tolls and other income from operation of the project and any payments to the authority from the state highway fund provided to be made pursuant to the provisions of said section 4; and that the average amount of the annual revenues to be received *from the operation and ownership of such project from the estimated opening of such project for traffic until the final maturity of the bonds to finance such project, over and above the cost of maintenance, repair and operation of such project, will be greater than the maximum amount established for any year for interest, principal and premium* by the provisions of clauses (i), (ii) and (iii) of section 4. (§ 2.)

"The state highway commission and the authority are hereby authorized and empowered to make and enter into any and all contracts and agreements, including (but without limitation) any contract or agreement for the removal or construction of any bridge or other highway facility which they may deem necessary, desirable or incidental to the financing, construction, maintenance, repair or operation of any turnpike project financed under the provisions of this act.

"With respect to any turnpike project financed under the provisions of this act, the commission is authorized and empowered to contract or agree with the authority to pay to the authority from the state highway fund, upon order or voucher of the commission in the manner provided by law to the state controller, in each year, such amount or amounts as shall be required in such year to make up any deficiency in the revenues received from the operation and ownership of such turnpike project in such year, over and above the cost of maintenance, repair and operation of such turnpike project incurred in such year; (i) for paying the interest on all turnpike revenue bonds or turnpike revenue refunding bonds issued by the authority in connection with such turnpike projects; (ii) for retiring such bonds at their maturity or maturities; and (iii) for paying the premium, if any, on an aggregate principal amount of such bonds equal to the portion of the annual payment computation hereinafter mentioned applicable to principal which would be payable in such year if such principal amount of bonds were to be redeemed prior to their maturity or maturities. . . ." (§ 4.)

"Revenue bonds issued under the provisions of this act shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision thereof, but all such bonds shall be payable solely from the funds herein provided therefor from revenues *and any payments to the authority from the state highway fund provided to be made pursuant to the provisions of section 4 of this act and pledged for their payment.* All such revenue bonds shall contain on the face thereof a statement to the effect that neither the state nor the authority shall be obligated to pay the same or the interest thereon except from revenues of the project or projects for which they are issued and any payments from the state highway fund pledged to the payment of such bonds, and that the faith and credit of the state are not pledged to the payment of the principal of or the interest on such bonds.

"All expenses incurred in carrying out the provisions of this act shall be payable solely from funds provided under the authority of this act and no liability or obligation shall be incurred by the authority hereunder beyond the extent to

which moneys shall have been provided under the provisions of this act." (Emphasis supplied.) (§ 7.)

The 1967 legislature authorized some additional turnpike studies by Laws of Kansas, Chapter 356, now appearing as K.S.A. 68-2051 to 2069, inclusive. The provisions for a preliminary study, and for the issuance of revenue bonds payable solely from revenues of the project paralleled the requirements in the original turnpike act. This enactment authorized the feasibility study of a toll road from Kansas City to the southeast corner of the state; studies were made, but the project was not found to be feasible.

Laws of 1972, chapter 249, now K.S.A. 68-2070 to 2092, inclusive, authorized certain toll road projects, including one from Wichita to the vicinity of Strother Field, in Cowley County. The act provides:

". . . No highway project shall be undertaken unless and until such project and the proposed locations therefor have been thoroughly studied with respect to traffic, engineering, cost and financing nor unless such study shows: That adequate public funds for construction of free expressways on the routes to be served by such project are not available, and that the construction of such project can be financed wholly through the investment of private funds in highway revenue bonds issued under the provisions of this act; and that such project and indebtedness incurred therefor will be entirely self-liquidating through tolls and other income from operation of such project or projects but not including any amounts to be paid from the state highway fund as permitted by this act: *Provided,* In determining whether the project and indebtedness will be entirely self-liquidating it shall be proper to consider actual and anticipated tolls and other income from any other project or projects financed under this act and also any reserves which are or will be available from proceeds of the bonds or any other source: *And provided further,* Once the authority has determined that such study, or the study as amended and supplemented, shows that the provisions of this section are met, the project or projects shall be undertaken and bonds herein authorized shall be issued and the validity of the project or projects and the validity of the bonds shall not be affected by any question concerning the determination of the authority. (§ 2.)

"The [Kansas turnpike] authority is hereby authorized and empowered to:

.  .  .  .  .  .  .  :  .  .  .  .  .  .  .  .  .

"(b) issue highway revenue bonds of the authority to pay the cost of any project, payable solely from the tolls and revenues derived therefrom and any payments to the authority from the state highway fund provided to be made pursuant to the provisions of this act which are pledged for their payment, and to refund its bonds, all as provided in this act; (§ 3.)

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"With respect to any highway project financed under the provisions of this act, the commission is authorized and empowered to contract or agree with the

authority to pay to the authority from the state highway fund, upon order or voucher of the commission in the manner provided by law to the state controller, in each year, such amount or amounts as shall be required in such year to make up any deficiency in the revenues received from the operation and ownership of any highway project in such year, over and above the cost of maintenance, repair and operation of such highway project and the creation of reserves for such purposes in such year, (i) for paying the interest on all highway revenue bonds or highway revenue refunding bonds issued by the authority in connection with any such highway project, (ii) for retiring such bonds by their maturity or maturities, and (iii) for paying the premium, if any, on a specified aggregate principal amount of such bonds which would be payable in such year if such principal amount of bonds were to be redeemed prior to their maturity or maturities. . . . Any such contract or agreement shall provide for reimbursement by the authority, from tolls or other revenues of such highway project to the commission for the credit of the state highway fund, at any time or times and under such terms and conditions as may be set forth therein, if any amounts previously paid to the authority by the commission pursuant to the provisions of this paragraph: *Provided, however,* That if the revenues received from the operation and ownership of such highway project in any year, over and above the cost of maintenance, repair and operation of such highway project incurred in such year, shall exceed one hundred fifty percent (150%) of clauses (i), (ii) and (iii) above for such year, such excess must be reimbursed to the commission, for the credit of the state highway fund, until all amounts previously paid to the authority by the commission have been reimbursed to the commission. (§ 4.)

. . . . . . . . . . . . . . . .

"Bonds issued under the provisions of this act shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision thereof, but all such bonds shall be payable solely from the funds herein provided therefor from revenues *and any payments to the authority from the state highway fund provided to be made pursuant to the provisions of this act and pledged for their payment.* All such bonds shall contain on the face thereof a statement to the effect that neither the state nor the authority shall be obligated to pay the same or the interest thereon except from revenues of any project and any payments from the state highway fund pledged to the payment of such bonds, and that the faith and credit of the state are not pledged to the payment of the principal of or the interest on such bonds." (§ 7.) (Emphasis supplied.)

Laws of 1973, chapter 269, authorizes a toll road, commencing near the city of Winfield, at a point of intersection with the Wichita-Strother Field expressway, and continuing in an easterly direction to a point on the Kansas-Oklahoma border in the vicinity of the cities of Galena and Baxter Springs. The 1973 act contains provisions substantially identical with those quoted from the 1972 act.

Laws of 1974, chapter 276, amended the 1973 enactments to authorize the state highway commission to make payments to the

authority not only from the state highway fund, but also from the state freeway fund. The pertinent provisions of the 1974 amendments are as follows:

". . . No highway project shall be undertaken unless and until such project and the proposed locations therefor have been thoroughly studied with respect to traffic, engineering, cost and financing, nor unless such study shows: That adequate public funds for construction of free expressways on the routes to be served by such project are not available, and that the construction of such project can be financed wholly through the investment of private funds in highway revenue bonds issued under the provisions of this act; and that such project and indebtedness incurred therefor will be entirely self-liquidating through tolls and other income from operation of such project or projects, but not including any amounts to be paid from the state highway fund or state freeway fund as provided by this act and the act of which this section is amendatory: *Provided,* In determining whether the project and indebtedness will be entirely self-liquidating it shall be proper to consider actual and anticipated tolls and other income from any other project or projects financed under this act and also any reserves which are or will be available from proceeds of the bonds or any other source: *And provided further,* Once the authority has determined that such study, or the study as amended and supplemented, shows that the provisions of this section are met, the project or projects shall be undertaken and bonds herein authorized shall be issued, and the validity of the project or projects and the validity of the bonds shall not be affected by any question concerning the determination of the authority. (§ 1.)

"The authority is hereby authorized and empowered to:

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(b) issue highway revenue bonds of the authority to pay the cost of any project, payable solely from the tolls and revenues derived therefrom and any payments to the authority from the state highway fund or state freeway fund provided to be made pursuant to the provisions of this act and the act of which this section is amendatory and which are pledged for their payment, and to refund its bonds, all as provided in this act; (§ 2.)

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"With respect to any highway project financed under the provisions of this act, the commission is authorized, empowered and directed to contract or agree with the authority to pay to the authority from the state freeway fund or state highway fund, upon order or voucher of the commission in the manner provided by law to the director of accounts and reports, in each year, such amount or amounts as shall be required in such year to make up any deficiency in the revenues received from the operation and ownership of any highway project in such year, over and above the cost of maintenance, repair and operation of such highway project and the creation of reserves for such purposes in such year, (i) for paying the interest on all highway revenue bonds or highway revenue refunding bonds issued by the authority in connection with any such highway project, (ii) for retiring such bonds by their maturity or maturities, and (iii) for paying the premium, if any, on a specified aggregate principal amount of bonds which would be payable in such year if such principal amount of bonds were to be redeemed prior to their maturity

or maturities. Any contract or agreement entered into pursuant to this section shall provide that all payments to the authority pursuant to this section shall be made from the state freeway fund, unless the moneys available in said fund for making such payments are insufficient; and in such event, such contract or agreement shall provide that any additional moneys needed to make any such payment or payments shall be paid from the state highway fund. . . . Any such payments required to be made pursuant to such contract or agreement may be pledged or assigned by the authority in the same manner as tolls and other revenues of such highway project. Any such contract or agreement shall provide for reimbursement by the authority, from tolls or other revenues of such highway project to the commission for the credit of the state highway fund or state freeway fund, at any time or times and under such terms and conditions as may be set forth therein, of any amounts previously paid to the authority by the commission pursuant to the provisions of this paragraph. . . .

"Any payments authorized . . . to be made to the authority from the state freeway fund in any year pursuant to the provisions of this section shall be a lien and claim on that portion of said freeway fund which is not otherwise obligated . . . The laws of Kansas shall not be repealed or amended so as to cause the moneys available in the state freeway fund for making any payments to the authority provided to be made pursuant to the provisions of this section to be insufficient to make any such payments. (§ 3.)

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"The authority is hereby authorized to provide by resolution at one time or from time to time for the issuance of not exceeding two hundred forty-two million dollars ($242,000,000) highway revenue bonds of the authority, unless such limitation is increased or repealed by law, for the purpose of paying the cost of any project or projects. The principal of and the interest on such bonds shall be payable solely from the funds herein provided for such payment, *including any payments to the authority from the state highway fund or state freeway fund provided to be made pursuant to the provisions of this act and the act of which this section is amendatory, and pledged for their payment.* . . . (4.) (Emphasis supplied.)

"Bonds issued under the provisions of this act shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision thereof, but all such bonds shall be payable solely from the funds herein provided therefor from revenues and any payments to the authority from the state highway fund or state freeway fund provided to be made pursuant to the provisions of this act and the act of which this section is amendatory, and pledged for their payment. All such bonds shall contain on the face thereof a statement to the effect that neither the state nor the authority shall be obligated to pay the same or the interest thereon except from revenues of any project and any payments from the state freeway fund or state highway fund pledged to the payment of such bonds, and that the faith and credit of the state are not pledged to the payment of the principal of or the interest on such bonds." (§ 5.)

The state freeway fund was created in the Laws of 1969, chapter 462, section 3, which now appears as K.S.A. 79-3425. By

section 18 of the 1969 act, the state highway commission was "authorized, empowered and directed to establish and construct a state system of modern express highways and freeways." The act was vetoed by then Governor Robert B. Docking, but the veto was overridden by a two-thirds majority of both houses of the legislature. Section 18, since amended, now appears as K.S.A. 68-2301.

The money allocated to the state freeway fund is derived from the tax on motor fuels imposed by article 34 of chapter 79 of the Kansas Statutes Annotated. See, K.S.A. 79-3425. The tax on motor fuels is imposed, as provided in K.S.A. 79-3402, "for the purpose of producing revenue to be used by the state of Kansas to defray in whole, or in part, the cost of constructing, widening, purchasing of right-of-way, reconstructing, maintaining, surfacing, resurfacing and repairing the public highways, including the payment of bonds heretofore issued for highways included in the state system of this state, and the cost and expenses of the director of this state and his or her agents and employees incurred in administration and enforcement of this act and for no other purpose whatever."

## BACKGROUND FACTS

Following the enactment of the 1973 act, the Turnpike Authority took steps to make the prerequisite studies for the "connector" and the Southeast Kansas Turnpike. The Authority retained three firms, each of whom had been retained to assist in the making of the required preliminary studies for the original Kansas Turnpike.

The Authority engaged the engineering firm of Coverdale & Colpitts, of New York City, to make an estimate of the potential traffic and the tolls and other revenues to be realized on each of the segments being considered, the proposed "connector" and the proposed Winfield to Galena turnpike.

Knoerle, Bender, Stone and Associates, Inc., a Chicago based civil engineering firm, was retained to do the needed engineering studies, and to estimate the cost of land acquisition, construction, operation, and maintenance of the proposed toll roads.

Finally, the brokerage house of E. F. Hutton & Company, Inc., of Kansas City, Missouri, was retained as financial consultant, to advise the Authority as to the feasibility of issuing and funding the bonds authorized for construction.

Extensive studies were made by each of these consultants.

Their initial reports were not favorable. For example, Coverdale & Colpitts reported in September, 1973, that the revenues then estimated "come nowhere near the revenues needed to pay [maintenance and operation] expenses and debt service for a bond issue *and would require support from the State Highway Fund."* (Emphasis supplied.) We should note, however, that this letter was premised upon the issuance of 20-year bonds, and the retirement of the bonds within that period.

In June, 1974, after the enactment of the amendments heretofore quoted, updated and final reports were made to the Authority by each of the consulting firms. Knoerle, Bender, Stone and Associates presented its final cost estimate; Coverdale & Colpitts presented an updated estimate of revenues over a *46-year* period (which was considerably more optimistic than its earlier forecasts); and E. F. Hutton & Company, basing its opinion upon the final reports of Knoerle, Bender, Stone and Associates and Coverdale & Colpitts, reported to the Authority that in its opinion the projects would be self-liquidating over the *40-year* life of the bonds, and the project was thus feasible.

The Authority determined that public funds were not available to build free expressways over the proposed routes. In reliance upon the reports received from the Knoerle, Coverdale, and Hutton firms, the Authority adopted a resolution on June 27, 1974, in which it recited the receipt of the reports and the making of a thorough study by the Authority with respect to traffic, engineering, cost and financing, and that construction of the proposed toll roads "can be financed wholly through the investment of private funds in highway revenue bonds . . .; that such highway revenue bonds . . . will be entirely self-liquidating through tolls and other income from operation of such expressway, but not including any amounts to be paid to the Authority [from] the State Highway Fund [or] State Freeway Fund . . . and . . . that with respect to such express highway, the Authority has determined that its study shows that the provisions of Chapter 269 of the Laws of Kansas, 1973, as amended by Section 2 of Chapter 275 and Section 1 of Chapter 276 of the Laws of Kansas, 1974, are met."

The Authority submitted its final report to the State Highway Commission on July 30, 1974. On August 14, 1974, the Authority and the Commission entered into contracts covering both proj-

ects. The Commission agreed to make payments to the Authority from the State Highway Fund, in connection with the "connector," and from the State Freeway Fund or the State Highway Fund, in connection with the Southeast Kansas Turnpike, as authorized by Laws of Kansas, 1972, Chapter 249, § 4 (now K.S.A. 1977 Supp. 68-2073) and Laws of Kansas, 1974, Chapter 276, § 3 (now K.S.A. 1977 Supp. 68-2096), respectively.

This injunction action was filed July 15, 1974. The matter was fully tried, briefed, and argued, and proposed findings of fact and conclusions of law were filed by counsel. On November 18, 1976, the trial court entered its order. It made lengthy and detailed findings of fact and conclusions of law. The conclusions of law are as follows:

"I.   The persons constituting the Southeast Kansas Landowners Association, including the individual plaintiffs named, the objectives of the action and the issues brought before this Court are such as to make this matter a proper class action per the requirements of K.S.A. 1973 Supp. 60-223(b).

"II.   Neither the Enabling Legislation nor any rule or regulation requires the Authority to state findings of fact in support of the determinations required by the Enabling Legislation and the Authority is not required to make any such findings of fact. Any failure by the Authority to make any such findings is not a basis for invalidating the Authority's determinations.

"III.   The Authority made the study required by the Enabling Legislation with respect to the Southeast Kansas Turnpike and the Connector. The method of accomplishing such study and the conclusions resulting from such study are matters within the discretion of the Authority and can be reviewed only for the purpose of determining whether the Authority's conclusions were in contravention of the Enabling Legislation or fraudulent or so arbitrary, capricious or unreasonable as to amount to fraud. The Authority did not act in contravention of the Enabling Legislation, did not act fraudulently and did not act so arbitrarily capriciously or unreasonably as to amount to fraud in making the study required by the Enabling Legislation, in passing the resolutions adopted on June 27, 1974, or in making the determinations set forth in those resolutions.

"IV.   The statutes which create, maintain and govern the distribution of the State Highway Fund include the Enabling Legislation. Said statutes authorize the payment of monies from the State Highway Fund to or on account of the Southeast Kansas Turnpike and/or the Connector projects for bond or bond-related deficiency payment purposes, and none of said statutes prohibit such payments.

"V.   Article XI, §§ 9 and/or 10 of the Constitution of the State of Kansas do not guarantee a state system of highways available for free, open public use and for general access to all parts of the state. The Enabling Legislation does not violate Article XI, § 9 or § 10 by pledging to or on account of the Southeast Kansas Turnpike and/or the Connector for bond or bond-related deficiency payments monies in the State Highway Fund.

"VI. The Enabling Legislation provides adequate standards respecting the payment of monies from the State Freeway Fund and/or the State Highway Fund. The Enabling Legislation is not an improper delegation of legislative power and does not violate Article 2, § 1 of the Constitution of the State of Kansas.

"VII. The Enabling Legislation is not comprised of special acts and does not violate Article 2, § 17 of the Constitution of the State of Kansas.

"VIII. The construction of the Southeast Kansas Turnpike and the Connector projects are public purposes. The exercise of the power of eminent domain in connection with the Southeast Kansas Turnpike and/or the Connector and pursuant to the Enabling Legislation will not be improper because of a lack of public necessity therefor and will not violate the Fifth Amendment, or Section 1 of the Fourteenth Amendment, of the Constitution of the United States or Sections 1, 2 or 18 of the Bill of Rights of the Constitution of the State of Kansas.

"IX. Plaintiffs' may not recover attorneys' fees or litigation costs other than ordinary court costs and may recover ordinary court costs only if plaintiffs prevail."

The trial court then entered judgment for the defendant on all issues; this appeal followed. We should note that as of this date, bonds have not been issued by the Authority to fund either project.

## RULES OF STATUTORY CONSTRUCTION

Before turning to the issues raised, we should review briefly the principal rules governing the judicial construction of acts of the legislature, and governing judicial review of the actions of administrative boards. The fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statutes. *Easom v. Farmers Insurance Co.,* 221 Kan. 415, Syl. 2, 560 P.2d 117 (1977); *Thomas County Taxpayers Ass'n v. Finney,* 223 Kan. 434, 573 P.2d 1073 (1978); *Brinkmeyer v. City of Wichita,* 223 Kan. 393, 573 P.2d 1044 (1978).

In determining legislative intent, courts are not limited to a mere consideration of the language employed, but may properly look to the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effect the statute may have under the various constructions suggested. *State, ex rel., v. City of Overland Park,* 215 Kan. 700, Syl. 10, 527 P.2d 1340 (1974); *State v. Luginbill,* 223 Kan. 15, 574 P.2d 140 (1977).

In construing a statute, the legislative intention is to be determined from a general consideration of the whole act. Effect must be given, if possible, to the entire statute and every part thereof.

To this end it is the duty of the court, so far as practicable, to reconcile the different provisions so as to make them consistent, harmonious and sensible. *Harris v. Shanahan,* 192 Kan. 629, 635, 390 P.2d 772 (1964); *Rogers v. Shanahan,* 221 Kan. 221, 228, 565 P.2d 1384 (1976).

The wisdom, justice, and expediency of legislation is not for judicial determination. *State, ex rel., v. Kansas Turnpike Authority,* 176 Kan. 683, 689, 273 P.2d 198 (1954).

The limitations on judicial review of the actions of administrative agencies, absent statutory guidance, were discussed in *Warburton v. Warkentin,* 185 Kan. 468, 345 P.2d 992 (1959), where at page 479, then Justice Schroeder said:

"While Kansas does not have an administrative procedure act, it has been held that our courts have jurisdiction over special tribunals established by statute, even though no right of appeal has been conferred by statute from the decisions of such special tribunals. The rules concerning ministerial acts of special tribunals established by statute and of public officers are well stated in *Allen v. Burrow,* 69 Kan. 812, 77 Pac. 555, as follows:

" 'It has often been said of special tribunals established by statute to pass on matters expressly committed to them that their jurisdiction is exclusive and their determinations final, and that courts will not review their conclusions nor inquire by what method they were reached, *but always with an express or implied reservation that the statement holds good only where the action of such tribunal is characterized by good faith, and is free from fraud, corruption, and oppression* . . . No rule is better settled than that courts will not interfere with public officers in the discharge of any duty involving the exercise of judgment or discretion, but this rule presupposes the existence of good faith, and relates to acts done under the guidance of opinions honestly formed, however mistaken in fact; it has no application to acts done under the influence of a corrupt motive. *Even arbitrary and capricious conduct, amounting to an abuse of discretion, will justify mandamus to compel a proper performance of duty, upon the theory that there has been, in fact, no real exercise of judgment* . . .' (Emphasis added.) (pp. 820, 821.)" (p. 479.)

### THE CONVENTIONAL REVENUE BOND ISSUE

The first and primary issue before us is whether the Authority, and the experts it retained, erred in failing to apply conventional revenue bond concepts. Plaintiffs contend that the enabling legislation for the southeast Kansas turnpike and the connector only authorized the issuance of conventional revenue bonds, or "conventional supported" revenue bonds. The defendant contends that the statutes authorized the issuance of "subsidized or guaranteed" revenue bonds.

The parties agree that there are three types of revenue bonds:

conventional or pure revenue bonds; "conventional supported" revenue bonds; and "subsidized or guaranteed" revenue bonds. Each requires a different type of study.

A conventional or pure revenue bond study, such as that conducted under the original Kansas Turnpike Act, is premised upon there being but a single source of funds: tolls and other revenues of the project, which must be adequate to pay all costs of maintenance and operation of the project, and all principal and interest payments on the bonds, for each year of the project, commencing with the first year. The amount of revenue projected for the project must be at least fifty per cent over the "break-even" point, in order to provide sufficient protection for investors.

A "conventional supported" revenue bond study is premised upon there being *two* sources of funds, tolls and other revenues from the project, and standby or supplementary funds. There must be sufficient anticipated revenues from the proposed project to pay all maintenance and operation cost plus principal and interest on the bonds, each year of the project, beginning with the first year; but, because an additional source of funds is provided, the amount of projected revenue need only equal the amount required to break even—an amount sufficient to pay the anticipated maintenance, operation, and bond expense. The supplementary source (in this case, the state freeway fund and the state highway fund) provides additional protection for the investors.

A "subsidized or guaranteed" revenue bond study is based upon the assumption that the revenues will *not* be sufficient to pay all expenses during the early years of the project. Such deficiency will be met by payments from a supplemental source. The study need only show that the project will be self-liquidating *over the designated life of the bonds.* The revenues need not be sufficient to pay all the costs for the first few years, as long as sufficient revenue is generated over the life of the project to pay all of the maintenance, operation, and bond expense, including repayment of advancements from the supplemental source made during the initial years.

All of the Kansas Turnpike statutes require that the project be self-liquidating; but in the acts now before us, the legislature has authorized additional and supplementary sources of funds for payment of the bonds and interest—payments from the State Highway Fund in the case of the connector, and from both the

State Freeway Fund and the State Highway Fund in the case of the Southeast Kansas Turnpike. If the legislature intended each project to pay its own way from the start, it could have said so, as it did in the 18th Street Expressway legislation. The legislature abandoned the pure or conventional bond revenue requirement of the original Turnpike act when it enacted the 1957, 1972, 1973, and 1974 acts.

When the 1974 amendments were before the Kansas legislature, Senator Bob Storey, who carried the amendments on the Senate floor, distributed to each senator a copy of a financial chart prepared by the controller of the State Highway Commission. This chart shows the amounts of money which the State Highway Commission estimated would be required to support the Southeast Kansas Turnpike during the initial years of its operation. The legislature was thus made aware that the projected tolls from the Southeast Kansas Turnpike would *not* be sufficient, in the initial years of its operation, to fund the project, and that supplemental funds from some other source or sources were necessary if the road were to be built. Such projections are not consistent with a plan for the issuance of either conventional revenue bonds or conventional supported revenue bonds. Both types require projections of revenue sufficient to meet all expenses, commencing with the first year of the project's operation. The projections before the Senate indicated clearly that the project would be unable to support itself during its early years. The repayment provisions contained in the acts indicate that the legislature intended the project to be self-liquidating, not at the start, but over the entire span.

Three separate, distinct, and independent findings are required by the enabling acts of 1972, 1973 and 1974. The Turnpike Authority must make each required finding before bonds can be issued and sold. The Authority has done so. The first finding is that adequate public funds are not available so that freeways can be built over the proposed routes. The Authority could and did make that determination without expert assistance.

The second is that the proposed *construction* can be financed—all construction costs can be paid — from the proceeds of the bonds. This the Authority determined from the construction cost estimates of Knoerle, Bender, and from the report of Hutton indicating that the necessary sums for construction could

be realized from the sale of the bonds. This finding is concerned with the initial financing of construction, not with revenues or operational costs thereafter, except insofar as those having a bearing upon the salability of the bonds.

The third required finding is that the project, including the indebtedness created by the issuance of bonds, will be entirely self-liquidating from tolls and other income from operation. Amounts advanced from the state freeway fund and the state highway fund must be repaid, and all operational, maintenance, bond and interest cost must be paid from the income generated by the project. The basis for this finding lies in the maintenance and operation cost estimates of Knoerle, Bender & Stone; the revenue estimates of Coverdale & Colpitts; and the amount of principal and interest of the proposed bond issue. Since the legislature knew that the project would not be self sufficient at the outset, the only rational construction of the legislative language is to hold that the legislature meant the project to be self-liquidating *over the term of the bonds.*

We hold that the 1972, 1973, and 1974 acts, each construed as a whole, authorize the issuance of "subsidized or guaranteed" revenue bonds, and that the Authority and the trial court did not err in so construing the acts.

## THE GENERAL OBLIGATION BOND ISSUE

Are the highway revenue bonds authorized by the enabling legislation violative of Article 11, § 9 of the Kansas Constitution? We think not. That section provides in part that "The state . . . may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor general obligation bonds issued by the state for such highways . . ."

Though the enabling acts authorize payments from the state freeway fund and the state highway fund, those funds are not raised by general property taxes; instead, both arise from the levy of special taxes on motor fuels. See Article 11, § 10 of the Kansas Constitution, and K.S.A. 79-3401, *et seq.,* as amended.

The bonds themselves, by the express terms of the statute, and by the express language required to be set forth on the face of the bonds, are not general obligation bonds. We conclude that the highway revenue bonds authorized by the 1972, 1973 and 1974 acts do not violate Article 11, § 9 of the Constitution.

## THE STUDIES

Plaintiffs contend that the studies made by Coverdale & Colpitts, and the other firms retained by the Authority, were not supported by the evidence, and that the conclusions in the several reports made to the Authority in June, 1974, were thus erroneous. All of plaintiffs' objections to the reports and the conclusions were thoroughly litigated in the trial court. In some instances plaintiffs' experts disagreed with the conclusions of those engaged by the Authority. As to land values, for example, plaintiffs' expert estimated the acquisition cost to be several times the figure arrived at by Knoerle, Bender & Stone. The trial court pointed out that the Knoerle, Bender & Stone estimate was the result of a tract by tract analysis, involving on-site viewing and several months of office work; plaintiffs' expert, on the other hand, had spent six days total office time on the appraisal.

The early Coverdale & Colpitts reports, as we have previously noted, were based upon a conventional bond approach; the later report was made by applying a subsidized or guaranteed bond approach to the data already on hand as a result of many months' work.

As is natural, appellants emphasize that evidence which would support conclusions favorable to appellants' position contrary to the conclusions reached by the consultant firms. It would extend this opinion unduly, and add nothing to this discussion, to include a detailed statement of the evidence disclosed in the voluminous record. We have carefully reviewed the evidence, however, and upon the whole of this record, we cannot say that the studies were insufficient or that the conclusions were not adequately supported and justified by the data at hand.

## SCOPE OF REVIEW

As the trial court observed, a court cannot substitute its judgment for that of an administrative body, nor can a court overturn the decision of an administrative body unless the court is clearly satisfied from the evidence that the decision was unlawful. Other exceptions would be where the decision was fraudulent, corrupt, arbitrary, or capricious. *Warburton v. Warkentin,* supra; *Brinson v. School District,* 223 Kan. 465, 467, 576 P.2d 602 (1978).

The decision by the Authority to build the Southeast Kansas

Turnpike and the Connector was an administrative decision. There is no contention that the decision was fraudulent or corrupt, and there is no evidence that it was made in bad faith, or that it constituted arbitrary or capricious action.

While the bringing of an action for an injunction is a proper means to challenge administrative action in the absence of a means of appeal, *Brinson v. School District,* supra, the granting or denial of an injunction is in most instances a discretionary matter. Absent manifest abuse of that discretion, an appellate court will not interfere. *South Shore Homes Ass'n v. Holland Holiday's,* 219 Kan. 744, 751, 549 P.2d 1035 (1976). The court below did not abuse its discretion in denying injunctive relief.

Plaintiffs complain because the Authority did not make detailed findings of fact, stating each of the facts upon which it based its decision. No rule, regulation or statute requires it to make such findings. Decisions of the Kansas Turnpike Authority are not ordinarily the subject of judicial review as are the orders of some administrative agencies, such as the State Corporation Commission. See *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 433 P.2d 572 (1967), and *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 440 P.2d 660 (1968), where the rationale of the requirement that the State Corporation Commission make findings of fact is discussed. That rationale is inapplicable here. It is only when an administrative body is acting in a quasi-judicial capacity that findings of fact are necessary; here the Authority was acting administratively and not in any judicial or quasi-judicial capacity.

We have carefully examined each of the other points raised by the appellants, and we conclude that they are without merit.

We should add a caveat, however, that our affirmance of the judgment below in nowise clears the way for the immediate issuance of the contemplated highway revenue bonds. Construction costs, land values, operational costs, and the bond market have all changed measurably since the studies were conducted in 1973 and 1974. Updated information must be secured, studies must be reworked, analyses must now be made and decisions reached on the basis of current information. The predictions of growth and highway development in southeast Kansas, made over four years ago, may now be viewed in retrospect and com-

pared with actuality. Any future administrative decision to proceed must be made in conformity with the statutory guidelines as set forth in the enabling acts.

The judgment is affirmed.