KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, *Plaintiff-Appellee*, v. REIMER & KOGER ASSOCIATES, INC., KENNETH H. KOGER, and BRENT A. MESSICK, *Defendants-Appellees/Cross-Appellants*, and GAGE & TUCKER, L.C., *Defendant-Appellant/Cross-Appellee*.

No. 74,395

KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, *Plaintiff-Appellee*, v. COHEN, BRAME & SMITH, P.C.; ROGER C. COHEN; REIMER & KOGER ASSOCIATES, INC.; and KENNETH H. KOGER, *et al.*, *Defendants-Appellees*, and GAGE & TUCKER, L.C., *Defendant-Appellant*.

927 P.2d 466

Opinion filed December 6, 1996.

*Jerome W. Pope*, of Winston & Strawn, of Chicago, Illinois, argued the cause, and *Dan K. Webb* and *Kurt L. Schultz*, of the same firm, and *Mark L. Bennett*, of Bennett & Dillon, of Topeka, were with him on the briefs for appellant Gage & Tucker, L.C.

*Anne Lamborn Baker*, of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., of Topeka, argued the cause, and *Thomas E. Wright*, of the same firm, was with her on the brief for defendant-appellees Cohen, Brame & Smith, P.C., and Roger C. Cohen.

*Brian G. Boos*, of Yeretsky & Maher, L.L.C., of Shawnee Mission, argued the cause, and *Gregory F. Maher* and *James M. Yeretsky*, of the same firm, and *Kathleen A. Hardee*, of Gilliland & Hayes, of Kansas City, Missouri, were with him on the brief for defendant-appellees/cross-appellants Reimer & Koger Associates, Inc., Kenneth H. Koger, and Brent A. Messick.

*Frank M. Rice*, of Schroer, Rice, P.A., of Topeka, argued the cause, and *Gene E. Schroer* and *Charles D. McAtee*, of the same firm, and *Eugene I. Pavalon* and *Geoffrey L. Gifford*, of Pavalon & Gifford, of Chicago, Illinois; *Barry J. Freeman*, *Robert S. Atkins*, *Timothy K. McPike*, and *Bess Schenkier*, of KPERS Litigation Group, of Chicago, Illinois; *Robert F. Coleman*, *Eugene J. Schiltz*, *Kenneth Philip Ross*, and *Jerry S. Menge*, of Robert F. Coleman & Associates, of Chicago, Illinois; and *Robin R. LaFollette*, *Donald H. Loudon, Jr.*, and *James L. Ungerer*, of KPERS

Litigation Group, of Shawnee Mission, were on the brief for appellee Kansas Public Employees Retirement System.

The opinion of the court was delivered by

DAVIS, J.: This interlocutory appeal involves the construction and constitutional validity of the recently enacted Kansas Public Employees Retirement System (KPERS) settlement statute, K.S.A. 1995 Supp. 74-4904a. The question posed is whether the cross-claims for "contribution and noncontractual indemnity" filed by Reimer & Koger Associates, Inc., (Reimer & Koger) against appellants are discharged under the provisions of K.S.A. 1995 Supp. 74-4904a(1). We conclude that such claims are discharged and that K.S.A. 1995 Supp. 74-4904a is constitutional. We, therefore, reverse the decision of the trial court.

### Facts

This appeal involves two consolidated cases from the Shawnee County District Court in which KPERS sued to recover for losses suffered in direct placement investments. In 92 CV 805, KPERS sought recovery for investment losses in Sharoff Food Service, Inc., (Sharoff) from Reimer & Koger and certain of its present or former directors, officers, or agents; the law firm of Gage & Tucker, L.C. (Gage & Tucker); and the law firm of Cohen, Brame, & Smith, P.C., (Cohen & Brame) and partner Roger C. Cohen (Cohen). In 93 CV 588, KPERS sought recovery for investment losses in Tallgrass Technology Corporation (Tallgrass) from Reimer & Koger.

In count 2 of 92 CV 805, KPERS alleges that Reimer & Koger was an investment advisor having discretion to invest KPERS money. In June 1987, Reimer & Koger invested $6.4 million of that money in Sharoff, primarily in subordinated ventures. In August 1988, Reimer & Koger made an additional $1.5 million unsecured investment of KPERS' money in Sharoff. At the time of each of the investments, Reimer & Koger, according to the allegations contained in KPERS' petition, knew or should have known that Sharoff was having severe financial difficulties and was in danger of failing. According to the petition, at the time of the $1.5 million unsecured investment, Reimer & Koger knew that Sharoff was in violation of covenants contained in the purchase agreement

for the initial investment and that Sharoff and its principal, Gary Fox, had made misrepresentations in connection with the initial investment. Nevertheless, according to the petition, Reimer & Koger failed to exercise the remedies available for the covenant violations, waived those violations, and proceeded with a second investment. Finally, according to the petition, after both investments were made, Reimer & Koger continued to receive information indicating that Sharoff was having severe financial difficulties and was in danger of failing but again failed to exercise any of the covenant remedies. Reimer & Koger's acts and omissions constituted, according to the petition, reckless conduct, gross negligence, and a violation of their contractual and fiduciary duties to KPERS.

In 1989, Sharoff's primary secured lender foreclosed, and Sharoff was placed in bankruptcy. KPERS' entire investment in Sharoff, approximately $9 million dollars, was lost.

Counts 1 and 3 of KPERS' petition are directed against Cohen & Brame and further allege misconduct by Fox. KPERS alleges, among other things, that the Cohen & Brame firm was Sharoff's attorney. Cohen was also an officer of Sharoff. It is alleged that Sharoff, Fox, and Cohen & Brame induced Reimer & Koger to invest KPERS' money in Sharoff by fraudulently misrepresenting such matters as Sharoff's financial condition, business plans, and other available sources of financing. Further, the petition alleges that Fox misused Sharoff's and KPERS' investments in Sharoff for his own personal benefit to the detriment of KPERS.

Count 4 of KPERS' petition is directed against Gage & Tucker, which had been hired by Reimer & Koger to represent KPERS. The principal allegation against Gage & Tucker is that in 1988, as to the second investment only ($1.5 million), and in early 1989, as to both of KPERS' investments in Sharoff, Gage & Tucker knew or should have known and failed to disclose to KPERS the Sharoff covenant violations, the remedies available for those violations, and Reimer & Koger's failure to exercise those remedies. The petition further alleges that Gage & Tucker failed to advise KPERS that the initial investment in Sharoff was impaired and that the second investment was imprudent.

Case 93 CV 588 arises out of KPERS' investment in Tallgrass. The defendants named in KPERS' petition are Reimer & Koger and certain of its present or former officers, directors, and/or agents. In a long, complex series of transactions spanning a period of several years, Reimer & Koger invested a total of $14.5 million of KPERS' money in Tallgrass.

The petition alleges that Tallgrass was a financially troubled company and that each of the investment transactions was, under the circumstances, imprudent; that Reimer & Koger continued to invest KPERS' money in Tallgrass, failed to take any action to protect or reduce KPERS' investment, and failed to disclose facts regarding Tallgrass and the investments to KPERS. By that conduct, the petition alleges, Reimer & Koger breached its contractual and fiduciary duties to KPERS and caused the loss of KPERS' investment in Tallgrass.

Gage & Tucker was not named as a defendant in KPERS' Tallgrass case 93 CV 588. However, KPERS provided Gage & Tucker with a draft petition that includes certain claims against Gage & Tucker arising out of the Tallgrass investment transactions. The principal allegation is that Gage & Tucker, employed by Reimer & Koger to represent KPERS, drafted the documents and otherwise assisted Reimer & Koger in consummating the Tallgrass transactions even though Gage & Tucker allegedly knew or should have known that Reimer & Koger was making bad investments, and that Gage & Tucker had failed to disclose that fact to KPERS. Gage & Tucker allegedly participated in the Reimer & Koger business decisions regarding the making and management of Tallgrass investments. Reimer & Koger allege that by its alleged acts and omissions, Gage & Tucker committed legal malpractice and assisted in any breach of trust committed by Reimer & Koger.

In May 1994, the Kansas Legislature enacted the KPERS settlement statute, K.S.A. 1995 Supp. 74-4904a, which provides protection for a defending party who enters into a settlement agreement with KPERS and obtains judicial approval of the settlement. The settling defendant is protected because the court's approval discharges the settling party from "all liability for contribution or

noncontractual indemnity" as to any other individual or entity. K.S.A. 1995 Supp. 74-4904a(1).

In September 1994, Gage & Tucker entered into a settlement agreement with KPERS as to KPERS' claim against the law firm in these two cases and other cases not subject to this appeal. Under the agreement, Gage & Tucker agreed to pay KPERS a total of $10 million, with $2.5 million allocated to the Tallgrass case and $1 million to the Sharoff case. The trial court found the settlement agreement to have been negotiated at arm's length by experienced counsel for the firm and KPERS and approved in a public meeting of the KPERS Board of Trustees. The court found that the agreement was a valid one supported by consideration. No appeal has been taken from this aspect of the case. The settlement agreement was expressly conditioned on the court's entry of orders in both cases approving the agreement and barring and dismissing all claims against Gage & Tucker for contribution or noncontractual indemnity in accord with K.S.A. 1995 Supp. 74-4904a.

In October 1994, KPERS moved for entry of orders approving the agreement in both cases. Reimer & Koger filed objections to the approval of the settlement in the Tallgrass case. Gage & Tucker filed a motion in the Tallgrass case for leave to intervene to support KPERS' motion to approve the settlement. On December 15, 1994, the court allowed Gage & Tucker to intervene in the Tallgrass case as a defendant.

On December 30, 1994, the trial court granted Reimer & Koger's request for leave to file a cross-claim against Gage & Tucker in the Tallgrass case. The cross-claim consists of two counts, both of which assert claims against Gage & Tucker for indemnity, contribution, and legal malpractice. The legal malpractice claim is not a part of this appeal.

In asserting its contribution and indemnity claims, Reimer & Koger argues that these cases are governed, at least in part, by Kansas law as it existed before July 1, 1987, when the Kansas comparative negligence statute (K.S.A. 60-258a) was made applicable to economic loss. Specifically, Reimer & Koger expressly characterize its theory of recovery against Gage & Tucker as one based on active/passive indemnity. Gage & Tucker argues that even if

these cases are governed by law prior to the comparative negligence statute, the court should approve the settlement agreement and dismiss Reimer & Koger's claims asserted in its cross-claim for active/passive indemnity as claims for "noncontractual indemnity" pursuant to K.S.A. 1995 Supp. 74-4904a. Reimer & Koger objected to the approval of the settlement, alleging that if the settlement was approved, the statute would bar a remedy that had been available in 1861 when the Kansas Constitution was adopted and would, therefore, violate § 18 of the Kansas Constitution Bill of Rights. Reimer & Koger further contends that barring its claims would violate due process, equal protection, and the doctrine of separation of powers.

After receiving briefs and hearing oral argument, the trial court filed its 101-page memorandum opinion and entry of judgment. The court approved the settlement in both cases but found that Reimer & Koger's claims for indemnity against Gage & Tucker were actually claims "arising by reason of contract" and, therefore, held that such claims for noncontractual indemnity are not discharged under K.S.A. 1995 Supp. 74-4904a. Thus, the court did not dismiss Reimer & Koger's cross-claim for contribution and indemnity against Gage & Tucker. The court also concluded that if K.S.A. 1995 Supp. 74-4904a discharged Reimer & Koger's noncontractual indemnity claims, the statute would violate § 18 of the Kansas Constitution Bill of Rights.

Gage & Tucker filed a motion to amend, asking the court to dismiss Reimer & Koger's contribution and indemnity cross-claim as barred by K.S.A. 1995 Supp. 74-4904a. Gage & Tucker timely filed a notice of appeal in both cases from the trial court memorandum opinion and from the trial court order denying the motion to amend the judgment. Gage & Tucker timely filed its appeal, and Reimer & Koger timely filed its cross-appeal, contending that K.S.A. 1995 Supp. 74-4904a violated § 18 of the Kansas Constitution Bill of Rights and violated due process, equal protection and the doctrine of separation of powers. Both the primary appeal and the cross-appeal were initially taken to the Kansas Court of Appeals. These cases were consolidated and transferred from the Court of Appeals to this court.

## K.S.A. 1995 Supp. 74-4904a

Before discussing the issues raised by the appeal and cross-appeal, we set forth the full text of the settlement statute, K.S.A. 1995 Supp. 74-4904a:

"(1) A judicially approved settlement of any claim or cause of action of the Kansas public employees retirement system against any party for any injury, loss or damage shall discharge the settling party from all liability for contribution or noncontractual indemnity to any other individual or entity that is or may be liable, in whole or in part, for the same injury, loss or damage, irrespective of whether or not such individual or entity has been joined as a party to any suit brought by the Kansas public employees retirement system, provided such individual or entity is notified, in any manner approved by the court, of the proceeding to approve the settlement not less than 20 days prior thereto. As used in this section, the term "noncontractual indemnity" includes indemnity between active and passive tortfeasors and indemnity based on principles of vicarious liability but does not include indemnity which arises by reason of contract.

"(2) When a release, covenant not to sue or agreement not to enforce a judgment is given in good faith by the Kansas public employees retirement system, the release, covenant not to sue or agreement not to enforce a judgment does not discharge any nonsettling party from liability, unless the terms of the release, covenant not to sue or agreement not to enforce a judgment so provide. However, nonsettling parties shall be entitled to a setoff against any claims that are made against them by the Kansas public employees retirement system and that are not covered by K.S.A. 60-258a and amendments thereto in the amount stated in the release, covenant not to sue or agreement not to enforce a judgment, or the amount of the consideration actually paid for it, whichever is greater.

"(3) Such settlement shall conclusively establish that the settling party has extinguished such settling party's share of the total liability and is not obligated for or entitled to pro rata contribution or noncontractual indemnity from any other individual or entity irrespective of whether or not such individual or entity has been joined as a party to the action and whose liability is not extinguished by the settlement.

"(4) The provisions of this act shall apply to any settlement judicially approved after the effective date of this act regardless of the date on which the Kansas public employees retirement system suffered any injury, loss or damage or the date on which any claim or cause of action of the Kansas public employees retirement system arose or accrued.

"(5) Except as provided in this act, the provisions of this act are not intended to alter the substantive law of Kansas relating to contribution, indemnity or comparative fault."

## Principles of Statutory Interpretation

Interpretation of a statute is a question of law, and it is a function of this court to interpret a statute to give it the effect intended by

the legislature. The fundamental rule of statutory construction, to which all others are subordinate, is that the intent of the legislature governs. *Cyr v. Cyr*, 249 Kan. 94, Syl. ¶ 2, 815 P.2d 97 (1991). In *State, ex rel., v. City of Overland Park*, 215 Kan. 700, 713, 527 P.2d 1340 (1974), this court said:

> "It is a primary rule of statutory construction that legislative intent be ascertained wherever possible. [Citation omitted.] In attempting to discover legislative intent, as it relates to a statute, we are not bound to an examination of the language alone but may look into the existing conditions—the causes which impelled its adoption and the objective sought to be attained. [Citations omitted.] In *City of Emporia v. Norton*, 16 Kan. 236, Mr. Justice Brewer, in speaking for the court, said:
>
> '. . . [N]ow in determining the intent of the legislature we are not limited to a mere consideration of the language employed. We may properly look to the purposes to be accomplished, the necessity and effect of the enactment under the different constructions suggested. . . .' (p. 239.)
>
> "Moreover, the law seems well established that the historical background of a legislative enactment, and the circumstances attending its passage, should be taken into account. [Citations omitted.]"

*Jackson v. City of Kansas City*, 235 Kan. 278, 319, 680 P.2d 877 (1984), perhaps best sums up our responsibility when we are called upon to interpret a legislative enactment:

> "In determining legislative intent, courts are not limited to a mere consideration of the language employed, but may properly look into the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished and the effect the statute may have under various suggested constructions. *Southeast Kansas Landowners Ass'n v. Kansas Turnpike Auth.*, 224 Kan. 357, 367, 582 P.2d 1123 (1978). A statute should never be given construction that leads to uncertainty, injustice, or confusion, if possible to construe it otherwise. In construing a statute words and phrases should be construed according to context and the approved usage of the language, and words in common use are to be given their natural and ordinary meaning. *Coe v. Security National Ins. Co.*, 228 Kan. 624, Syl. ¶ 2, 620 P.2d 1108 (1980). It should be remembered that legislative interpretation is a question of law. *Coleman v. Brotherhood State Bank*, 3 Kan. App. 2d 162, 171, 592 P.2d 103 (1979)." 235 Kan. at 319.

### Trial Court Decision

In its conclusions of law, the trial court keys upon the words of the settlement statute which purport to "discharge the settling party [Gage & Tucker] from all liability for contribution or non-

contractual indemnity to any other individual or entity that is or may be liable, in whole or in part, for that same injury, loss or damage." K.S.A. 1995 Supp. 74-4904a(1). It sought in a very scholarly manner to determine the meaning of the term "noncontractual indemnity" and concluded, after an examination of English common law, early and recent United States common law, and the law of Kansas, that noncontractual indemnity claims are contract claims. Since *noncontractual indemnity* claims are, according to the trial court, claims which *arise by reason of contract* (K.S.A. 1995 Supp. 74-4904a[1]), the noncontractual indemnity claims of Reimer & Koger are not discharged under K.S.A. 1995 Supp. 74-4904a.

The trial court noted:

"Thus, while the statute uses some definitional code words often seen in cases which really involve, once stripped of the improper verbiage, *i.e.*, 'active and passive tortfeasors,' and which may involve thereby 'indemnity based on principles of [vicarious] liability,' that is, secondary liability, the firm common law indemnity relief accorded to a contract implied of fact, the statutory language expressly and properly excludes such character of contract, notwithstanding any improper verbiage, by removing from its parameters 'indemnity which arises *by* reason of contract' (emphasis supplied) which is the very principle underlying a contract implied of fact.

. . . .

"Therefore, it may correctly, reasonably, and enlightenly be said, and most importantly can be said without implicating due process concerns, that there can be no impact from K.S.A. 74-4904a if correctly interpreted and applied in terms of any probable claims for noncontractual indemnity in case 93 CV 588 and 92 CV 805 arising prior to July 1, 1987, the date, as noted, the Kansas comparative negligence statute was effective, as amended, to include economic loss."

Absent from the trial court's consideration is the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished by the enactment, and the effect the enactment may have under the various suggested constructions. The trial court's interpretation frustrates legislative intent by failing to consider the causes which impelled the legislature to enact K.S.A. 1995 Supp. 74-4904a, the objectives sought to be attained, the historical background of the legislative enactment, and in some instances, the language of the statute itself.

## Discussion and Analysis

*Historical Background*

This appeal arises out of a settlement reached between KPERS and the law firm of Gage & Tucker in three of a number of suits filed by KPERS in the early 1990's as a result of substantial losses it suffered in its direct placement investment program. Twelve such cases are currently pending. Four of the 12 arose out of KPERS' investment in Home Savings Association of Kansas City, F.A. (Home Savings). Each of these cases was originally filed in the district court in Shawnee County, and three of the four were subsequently removed to the United States District Court for the Western District of Missouri after one or more of the defendants filed third-party claims against the Resolution Trust Corporation, the receiver of Home Savings. The fourth Home Savings case remains pending in the Shawnee County District Court, but the federal district court has enjoined KPERS from prosecuting it.

The other eight cases arise out of eight other direct placement investments and each of these suits is currently pending in the Shawnee County District Court. The settlement with Gage & Tucker that is at issue in this appeal arises out of the firm's alleged role as attorney for KPERS in three of these investments: Home Savings, Sharoff, and Tallgrass. The orders appealed from in this case were entered by the Shawnee County District Court in the Sharoff and Tallgrass cases; as of the filing of briefs in this case, the federal court had not yet ruled on the joint motion by KPERS and Gage & Tucker for approval of the settlement in the Home Savings cases. The losses sustained by KPERS in the two cases herein involve losses of $14.5 million in the Sharoff case and $9.5 million in the Tallgrass case. Based on the number of cases filed and the losses sustained in the two above cases, the litigation most probably will involve millions of dollars.

In May 1994, the Kansas Legislature enacted K.S.A. 1995 Supp. 74-4904a. It provides protection for a defending party who enters into a settlement agreement with KPERS and obtains judicial approval of the settlement. The settling defendant is protected because the court's approval discharges the settling party from "all

liability for contribution or noncontractual indemnity" as to any other individual or entity. K.S.A. 1995 Supp. 74-4904a(1). The settlement statute defines noncontractual indemnity as including indemnity between active and passive tortfeasors and indemnity based on principles of vicarious liability but, as noted above, does not include indemnity which arises by reason of contract. K.S.A. 1995 Supp. 74-4904a(1).

The circumstances surrounding the passage of this statute make it crystal clear that the legislature intended to facilitate settlement and avoid protracted litigation by relieving settling parties from contribution and noncontractual indemnity claims.

*Legislative History*

K.S.A. 1995 Supp. 74-4904a was initially proposed as S.B. 751. The bill was approved as amended according to the report of the Senate Committee on Judiciary. However, a virtually identical bill, H.B. 3098, was subsequently introduced and passed both the House and Senate as a whole, without committee hearings. That bill was enacted and became the KPERS settlement statute.

The records of the Senate Judiciary Committee include a summary of certain testimony given before the Committee in support of S.B. 751. This summary, presented to the trial court, reflects the testimony of Thomas V. Murray, legal counsel to the KPERS Board of Trustees.

Murray's summarized testimony is enlightening, and a number of passages are best reviewed as they appear in the original:

"The purpose of Senate Bill #751 is to aid KPERS in settling with defendants in the pending litigation involving losses to KPERS resulting from direct placement investments.

"KPERS currently has ten lawsuits pending involving these investments. Each lawsuit names a number of defendants. Because of the varying relationship of the defendants to KPERS and the investments, the claims made in the lawsuits include a number of legal theories. Some claims are based on negligence alone; others are based on violation of contract rights; and still others allege breach of fiduciary duty, gross negligence, securities fraud and other similar torts.

"As this litigation has progressed there have been negotiations with some of the defendants regarding settlement, and some firm settlement offers have been made. However, concern has been expressed by defendants that if they settle the

KPERS claims against them, other defendants, or other parties not yet made defendants but later sued, would be in a position to sue them and bring them back into the litigation, seeking indemnity or contribution. Senate Bill #751 is designed to overcome this obstacle to the settlement of KPERS' claims."

The statement explains that some of the investments were made prior to July 1, 1987, the date the comparative negligence law became applicable to economic loss. Murray states that prior to the initial version of the comparative negligence law as enacted in 1974, Kansas courts had adopted a theory of active/passive negligence in which indemnity could be sought by one whose negligence had been "passive, implied or constructive," against another whose negligence had been "active, primary or direct." Murray states that the concept of active/passive indemnity was, according to judicial interpretation, eliminated by the comparative negligence law in 1974. But, since claims for economic loss were not covered by the comparative negligence law between 1974 and July 1, 1987, and some of the KPERS investments were made during that period of time, some nonsettling defendants could claim that their negligence as to the KPERS investments was "passive," whereas a settling defendant's negligence was "active," and seek indemnity against the settling defendant. As Murray explained: "Thus, without the proposed Senate Bill #751, defendants settling with KPERS believe they face the risk and expense that other defendants will seek indemnity against them on the basis of the active/passive negligence concept."

Murray then stated that the proposed statute would provide protection for settling defendants from claims for noncontractual indemnity defined as including " 'indemnity between active and passive tortfeasors and indemnity based on principles of vicarious liability.' " *The summarized testimony clearly states that the protection does not apply to "a contractual right of indemnity," that is, the statute "does not interfere with the rights and obligations created by such contract between the parties."* Finally, Murray explained: "The Bill relieves the defendants from concern that they will run the risk of being found liable pursuant to the 'active/passive' negligence theory."

The Senate Judiciary Committee's minutes also summarized Murray's testimony, including the statement "Mr. Murray said this bill assures the settling party they would not be brought in on a claim that would not be covered by statute K.S.A. 60-258(a) [*sic*]."

From the legislative materials available, it is obvious that K.S.A. 1995 Supp. 74-4904a was enacted for the purpose of encouraging settlement between KPERS and various defendants in litigation over the losses incurred in direct placement investments. Moreover, the statute was enacted to protect settling defendants (while providing notice, appeal, and setoff protection for nonsettling defendants) from contribution and indemnity claims which could not be brought under the comparative negligence law, K.S.A. 60-258a, specifically including claims arising from the active/passive negligence theory for injuries sustained prior to July 1, 1987.

*The Effect of K.S.A. 1995 Supp. 74-4904a Under the Various Constructions Suggested*

The determination by the trial court that "noncontractual indemnity," including "indemnity between active and passive tortfeasors and individuals based on principles of vicarious liability," arises by reason of contract and is, therefore, not discharged under K.S.A. 1995 Supp. 74-4904a excludes claims from the statute that were intended to be included. As construed, any person or entity who arguably under any indemnity theory is or may be liable in whole or part for the same loss or damage, after reaching a settlement judicially approved under K.S.A. 1995 Supp. 74-4904a, may again be brought into the litigation under K.S.A. 60-213(h) or K.S.A. 60-214; thus, K.S.A. 1995 Supp. 74-4904a fails to provide the protection contemplated by the legislature.

A complete discussion of what K.S.A. 1995 Supp. 74-4904a(1) means by noncontractual indemnity must also address what is meant by indemnity claims that arise "by reason of contract." As we interpret K.S.A. 1995 Supp. 74-4904a, "arises by reason of contract,"consistent with legislative history, means "rights and obligations created by such contract between the parties." This would include contract claims that arise by reason of express indemnity, contracts such as hold harmless agreements, surety contracts, or

written guarantees. The legislature intended by the phrase "but does not include indemnity which arises by reason of contract" to exclude from the statutory discharge those claims based upon contracts created by and between the parties instead of noncontractual indemnity claims based upon obligations implied in fact or law.

The legislature is aware of the constitutional freedom to contract and the resultant limits on its ability to impair that right. See *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. 20, 28, 643 P.2d 87 (1982). This is evident in the settlement statute's acknowledgement that its discharge provision does not affect indemnity arising "by reason of contract." However, the statute also acknowledges that the legislature may permissibly effect other remedies available to the parties, as long as such legislation satisfies any constitutional restrictions that may apply. It makes clear sense, then, to conclude that the legislature intended K.S.A. 1995 Supp. 74-4904a(1) to protect contribution and indemnity arising by agreement between the parties while altering the ability of the parties to seek contribution and noncontractual indemnity, which arise by implication and are not accorded the deference afforded to rights and obligations created by contract between parties. See *Manhattan Buildings, Inc.,* 231 Kan. at 20.

The trial court's interpretation is too restrictive and fails to consider those time-honored principles of statutory interpretation applied in almost every case by this court when a statute is called into question. While its analysis of noncontractual indemnity, out of context, demonstrates that the development of this term under English and United States common law, including Kansas law, evolved from contract principles, it does not follow that the legislature intended to exclude those claims from its provisions.

The trial court's interpretation wholly frustrates the object of the legislation, which is to discharge the precise claims the trial court's interpretation allows. Accepting the trial court's interpretation would result in protracted, continued litigation; complete uncertainty as to continuing liability of the settling party; and, most certainly, the inability to reach settlements in KPERS litigation.

In the cases before us, the contribution and noncontractual indemnity claims that Reimer & Koger advance against Gage &

Tucker do not arise by agreement between the parties but arise and are in the nature of "indemnity between active and passive tortfeasors" and "indemnity based on principles of vicarious liability." The actual claims, as revealed by the record, are ones for indemnity based on active and passive negligence according to the allegations of Reimer & Koger. Sounding in tort, Reimer & Koger claims that the true party at fault was Gage & Tucker because of its active participation in representing KPERS at the request of Reimer & Koger, and that Gage & Tucker is liable, in whole or in part, for any breach of duty alleged by KPERS against Reimer & Koger. The claims fit within the term "noncontractual indemnity" as defined by K.S.A. 1995 Supp. 74-4904a.

*Statutory Language*

The sentence structure in K.S.A. 1995 Supp. 74-4904a supports this court's interpretation regarding the meaning of the term "noncontractual indemnity." The statute addresses two kinds of indemnity claims, contractual ("which arise by reason of contract") and noncontractual. Under the statute, a judicially approved settlement discharges the latter type of indemnity claims but not the former. The statute states that noncontractual indemnity includes indemnity between active and passive tortfeasors *and* indemnity based on vicarious liability principles. The use of the conjunctive "and" between the active/passive phrase and the vicarious liability phrase indicates the two phrases share a common aspect distinguishing them from indemnity "which arises by reason of contract."

At the time K.S.A. 1995 Supp. 74-4904a was enacted, this court had already described indemnity claims as falling into two broad categories:

"The first (and more usual, since indemnity is a creature of contract) occurs when there is an express contract of indemnity, such as a 'hold harmless' agreement. [Citations omitted.] It is the second type of indemnity *implied* indemnity, which is at issue in this case. A contract of indemnity may be implied when one is compelled to pay what another party ought to pay. [Citations omitted.] This may arise in a case of implied or constructive liability when one personally without fault is made to pay for the tortious acts of another; liability of a principal in *respondeat superior* for the acts of an agent or employee provides a good example." *Kennedy v. City of Sawyer*, 228 Kan. 439, 455, 618 P.2d 788 (1980).

*Kennedy* discussed and adopted "a variant of the implied indemnity contract as recognized in Kansas," in which one defendant's fault is passive as compared to another defendant's active fault. 228 Kan. at 455.

In light of *Kennedy*, of which the legislature is presumed to have knowledge (see *State v. Trudell*, 243 Kan. 29, 34, 755 P.2d 511 [1988]), the most reasonable construction of the statute is that "noncontractual indemnity" be read to encompass implied indemnity in all its various forms. Those various forms include indemnity based on vicarious liability and indemnity based on active/passive fault (a "variant" of implied indemnity).

Consistent with legislative intent, historical background, the purpose to be accomplished and the language used, K.S.A. 1995 Supp. 74-4904a differentiates between noncontractual indemnity and rights and obligations created by contract between parties. Under the terms of the statute, a judicially approved settlement discharges the settling party from all liability for contribution or noncontractual indemnity but provides no discharge for claims based on a contract or agreement between parties.

## Constitutionality of K.S.A. 1995 Supp. 74-4904a

While the trial court concluded that K.S.A. 1995 Supp. 74-4904a did not discharge claims for noncontractual indemnity that we have found are discharged by the statute, the trial court further concluded that such claims existed under Kansas law at the time of the adoption of the Kansas Constitution. Thus, the trial court concluded that if K.S.A. 1995 Supp 74-4904a discharges such claims, the statute would then violate § 18 of the Kansas Constitution Bill of Rights because it fails to provide an adequate quid pro quo. Reimer & Koger challenges the constitutionality of K.S.A. 1995 Supp. 74-4904a on the basis of § 18 and further claims that the statute denies it due process of law and equal protection and violates the doctrine of separation of powers.

Before addressing the constitutional issues raised, we must reiterate the basic principle of statutory construction concerning the constitutionality of a statute. In *State v. Bryan*, 259 Kan. 143, Syl. ¶ 1, 910 P.2d 212 (1996), we stated:

"The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt."

An important date to keep in mind when considering a question of constitutionality of the KPERS settlement statute is July 1, 1987. On this date, the Kansas comparative negligence statute, K.S.A. 60-258a, was made to apply to damages for economic loss. L. 1987, ch. 221, § 1. Claims for economic loss arising after July 1, 1987 would, therefore, be resolved according to K.S.A. 60-258a, that is, comparative negligence principles, with each entity being responsible for its portion of the total damages awarded. Thus, as the trial court recognized, K.S.A. 1995 Supp. 74-4904a operates, at least as insofar as its constitutional implications are concerned, as to rights and remedies for those claims arising on or before July 1, 1987.

*Contribution*

Contribution between joint tortfeasors in the absence of an express contract was not a remedy which existed at common law. "Kansas adheres to the common law rule that there is no right of contribution between joint tort-feasors." *Alseike v. Miller*, 196 Kan. 547, Syl. ¶ 4, 412 P.2d 1007 (1966).

The claims asserted by Reimer & Koger against Gage & Tucker are tort based, that is, based upon a breach of duty owed, resulting in damages. Since there never has been a common-law right of contribution for joint tortfeasors in Kansas, § 18 of the Kansas Constitution Bill of Rights is not implicated. The legislature may abolish the remedy without any restrictions imposed by the Kansas Constitution since such right did not exist at common law at the time Kansas adopted its constitution in 1861.

However, Kansas did adopt a statute which provides for contribution among judgment debtors. K.S.A. 60-2413(b) (originally enacted as G.S. 1901, § 4926) provides:

"A right of contribution or indemnity among judgment debtors, arising out of the payment of the judgment by one or more of them, may be enforced by execution

against the property of the judgment debtor from whom contribution or indemnity is sought."

In *Fort Scott v. Railroad Co.*, 66 Kan. 610, 612, 72 Pac. 238 (1903), this court held that G.S. 1901, § 4924 applied to judgments sounding in tort as well as those based on contract.

Thus, contribution in Kansas is governed by statute, K.S.A. 60-2413, and the legislature is free to alter the effects of such statute by a subsequent enactment. In this case, it did so in 1995 by "discharg[ing] the settling party from all liability for contribution." K.S.A. 1995 Supp. 74-4904a. Such legislative action does not violate § 18 of the Kansas Constitution Bill of Rights as it relates to the statutory right of contribution.

*Indemnity*

In *Russell v. Community Hospital Association, Inc.*, 199 Kan. 251, 428 P.2d 783 (1967), we addressed a claim of indemnity, recognizing the general rule that in the absence of an express contract there is no contribution between joint tortfeasors. However, as related to third-party practice under K.S.A. 60-214 (Corrick), we recognized a distinction between contribution and indemnity. Where the parties are not in pari delicto and their negligence is substantially different, not merely in degree but in character, it is generally recognized that indemnity may be awarded. *Russell*, 199 Kan. at Syl. ¶ 2.

In *Russell*, the hospital had been sued by the plaintiff for injuries sustained when he missed his footing and fell on certain outdoor steps which led to the parking lot of the hospital. The hospital, under 60-214, alleged that "if such stairways were improperly constructed, the responsibility therefor lies with the General Contractor and Architect designing and constructing said stairways." 199 Kan. at 252.

The trial court dismissed the hospital's third-party claim against the general contractor and architect. This court, on appeal, said that the third-party claim is not one designed to exact contribution between joint tortfeasors but one designed to seek indemnity from the third-party defendants by reason of their primary liability—a situation encompassed within the provisions of K.S.A. 60-214(a).

We have, therefore, treated contribution differently from indemnity. Neither *Russell* nor *Kennedy* addressed the question of whether the right of indemnity, that is, noncontractual indemnity as used in K.S.A. 1995 Supp. 74-4904a, existed at the time of the adoption of the Kansas Constitution and, thus, implicates § 18 of the Kansas Constitution Bill of Rights. However, we do not need to dwell on this question at length.

Suffice it to say that the trial court, in its decision, traces the evolution of noncontractual indemnity under common law and makes a persuasive case for the conclusion that such indemnity was based in its infant stages on the common-law action of assumpsit. Early evolution of the action for noncontractual indemnity suggests that such an action, although based in tort, depended upon contract principles for providing a remedy in both law and equity courts at common law. For the purposes of this opinion, we agree with the trial court that at least to some degree, noncontractual indemnity as a remedy existed at common law and was a remedy which predated the adoption of the Kansas Constitution.

*Section 18 of the Kansas Constitution Bill of Rights*

Section 18 provides: "**Justice without delay**. All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay."

In *Bair v. Peck*, 248 Kan. 824, 838, 811 P.2d 1176 (1991) (quoting from *Noel v. Menninger Foundation*, 175 Kan. 751, 763, 267 P.2d 934 [1954]), we noted:

" 'Remedy by due course of law,' so used, means the reparation for injury ordered by a tribunal having jurisdiction in due course of procedure after a fair hearing. It is the primary duty of the courts to safeguard the declaration of right and remedy guaranteed by the constitutional provision insuring a remedy for all injuries."

We recognized in *Bair* that the legislative act curtailing vicarious liability in medical malpractice litigation did abrogate a "remedy" within the purview of § 18. 248 Kan. at 838. Likewise, we conclude that at least to some degree the provisions of K.S.A. 1995 Supp. 74-4904a abrogate a remedy for noncontractual indemnity within the purview of § 18 of the Kansas Constitution Bill of Rights.

In *Bair*, we said the legislature can modify common law so long as it provides an adequate substitute remedy for the right infringed or abolished. Therefore, as in *Bair*, we must now determine whether the legislature has provided a sufficient quid pro quo, or substitute remedy, for its abrogation of the common-law remedy for noncontractual indemnity.

## Quid pro quo

We recognized in *Bair v. Peck* that there are limitations upon the legislature's authority to modify a common-law remedy. According to Kansas law, the legislature must enact an adequate substitute remedy, or quid pro quo, in order to constitutionally abolish a common-law right covered by § 18 of the Kansas Constitution Bill of Rights. *Bair v. Peck*, 248 Kan. at 839.

Reimer & Koger argues that K.S.A. 1995 Supp. 74-4904a violates § 18 because it takes away its claims without giving an adequate substitute remedy. Gage & Tucker claim that even if § 18 applies, the statute provides an adequate remedy in two ways: K.S.A. 1995 Supp. 74-4904a gives nonsettling defendants the substitute remedy of setoff and offers those defendants protection from indemnity claims should they decide to settle with KPERS.

K.S.A. 1995 Supp. 74-4904a(2) provides:

"(2) When a release, covenant not to sue or agreement not to enforce a judgment is given in good faith by the Kansas public employees retirement system, the release, covenant not to sue or agreement not to enforce a judgment does not discharge any nonsettling party from liability, unless the terms of the release, covenant not to sue or agreement not to enforce a judgment so provide. *However, nonsettling parties shall be entitled to a setoff against any claims that are made against them by the Kansas public employees retirement system and that are not covered by K.S.A. 60-258a and amendments thereto in the amount stated in the release, covenant not to sue or agreement not to enforce a judgment, or the amount of the consideration actually paid for it, whichever is greater.*" (Emphasis added.)

The statutory remedy of setoff provides nonsettling parties with a remedy of value which did not exist at common law. In a sense it is a substitute for the common-law remedy of noncontractual indemnity. Moreover, the statute confers a valuable benefit upon any person or entity potentially liable who settles and obtains court

approval with prior notice to those parties affected. K.S.A. 1995 Supp. 74-4904a(1).

Gage & Tucker cites to *Bair* and *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990), *overruled in part* 248 Kan. 824, 844, 811 P.2d 1176 (1991), as examples where § 18 quid pro quo has been satisfied, although the substitute remedy did not provide an exact replacement for the remedy abolished, or a replacement at all for some potential plaintiffs. *Bair*, 248 Kan. 824 (statute eliminated doctrine of vicarious liability in medical malpractice cases); *Samsel*, 246 Kan. 336 (statute limited recovery of noneconomic damages in all medical malpractice cases to $250,000 or less). Each case must be decided on its own merit, for our law does not require a complete balance and equality between the benefits conferred by statute in the place of the common-law remedy.

Reimer & Koger argues that in determining what is an adequate quid pro quo, this court must review whether the new law is required by public policy. However, the test is more refined. We emphasized in *Samsel*:

"Our constitution does not make this court the critic of the legislature; rather, this court is the guardian of the constitution and every legislative act comes before us with a presumption of constitutionality. . . . In determining whether a statute is constitutional, courts must guard against substituting their views on economic or social policy for those of the legislature." 246 Kan. at 348.

In reviewing *Manzanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974), where this court found § 18 was not violated by the limitation on recovery for pain and suffering in certain cases under the Kansas Automobile Injury Reparations Act, (K.S.A. 40-3101 *et seq.*), the court in *Samsel* stated: "We again recognized it was not within the province of this court to weigh the desirability of social or economic policy underlying a statute, or to weigh the beneficial results flowing from any particular legislative policy." 246 Kan. at 357.

While dealing with a narrow subject, the legislature clearly has authority to exercise supervisory control over KPERS. The State, as expressed in K.S.A. 1995 Supp. 74-4904a, has an interest in promoting settlement of all cases involving KPERS. This interest

also extends to the benefit of those potentially liable, for it gives them a way out through a judicially approved settlement. Without such legislation, given the magnitude of the claims involved and the possible contribution and noncontractual indemnity claims among the numerous entities and individuals potentially liable, settlement would be unattractive and litigation would most certainly go on indefinitely. The result would consume resources not only of the State and the courts of this state, but resources of the parties, involving incalculable expenses for all concerned.

The following conclusions may be drawn: The State has a legitimate interest in resolving KPERS litigation; K.S.A. 1995 Supp. 74-4904a directly addresses this concern by promoting settlement of claims; under the statutory provisions nonsettling and settling parties receive real and substantial benefits nonexistent at common law; and such benefits provide an adequate quid pro quo for the common-law remedy. We conclude that K.S.A. 1995 Supp. 4904a does not violate § 18 of the Kansas Constitution Bill of Rights.

*Due Process*

Reimer & Koger argues that the settlement statute violates due process protection because it deprives it of its "vested" right to seek indemnity from Gage & Tucker. Gage & Tucker argues that Reimer & Koger's claims are not entitled to due process protection because they have not yet "vested." A cause of action for indemnity does not accrue until the indemnitee (Reimer & Koger) suffers actual loss or damage by paying money for which the indemnitee seeks indemnification. "Simply because one has been found liable for an obligation of another, it does not necessarily follow that one is entitled to indemnification. A condition precedent to indemnification is that the indemnitee must actually have paid on the obligation for which he seeks indemnification." *Leiker v. Gafford*, 249 Kan. 554, 558-59, 819 P.2d 655 (1991).

In *Leiker*, we said that " 'a cause of action for indemnity based on tort does not accrue until the indemnitee has suffered an actual loss.' " 249 Kan. at 558 (quoting 41 Am. Jur. 2d, Indemnity § 32). If the trial court were to find Reimer & Koger not liable to KPERS,

no cause of action would accrue at all as to Reimer & Koger's allegations against Gage & Tucker.

The same can be said of actions for contribution. A cause of action for contribution does not accrue until a judgment is entered jointly against two or more defendants and one of them pays more than his or her pro rata share of the liability. See *McKinney, Administrator v. Miller*, 204 Kan. 436, 464 P.2d 276 (1970).

Because the trial court has not yet ruled whether Reimer & Koger is liable for damages to KPERS, and Reimer & Koger has not yet paid any such damages to KPERS, its claims for contribution and/or indemnity are not vested rights. Rights are vested when the right to enjoyment, present or prospective, has become the property of a particular person as a present interest. *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. 469, 473, 618 P.2d 778 (1980). "[A] mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right." 228 Kan. at 473-74; see *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 365-68, 892 P.2d 497 (1995). Reimer & Koger's claims do not constitute vested rights entitled to due process protection under the Kansas or United States Constitutions.

*Equal Protection*

Reimer & Koger asserts K.S.A. 1995 Supp. 74-4904a violates equal protection principles of the Kansas and United States Constitutions. It argues that its claims for indemnity constitute fundamental rights under § 18 of the Kansas Constitution Bill of Rights and, as such, trigger a strict scrutiny test for the settlement statute. It alleges that the statute fails this test.

The first step in an equal protection analysis is determining which level of scrutiny to apply to a statute which distinguishes between classes of individuals. *Leiker v. Gafford*, 245 Kan. 325, 362, 778 P.2d 823 (1989); *Bair v. Peck*, 248 Kan. at 830. Kansas courts have delineated three levels of scrutiny: (1) the rational basis test to determine whether a statutory classification bears some reasonable relationship to a valid legislative purpose; (2) the heightened scrutiny test to determine whether a statutory classification

substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny test to determine whether a statutory classification is necessary to serve some compelling state interest. *Bair v. Peck*, 248 Kan. at 830-31 (citing *Farley v. Engelken*, 241 Kan. 663, Syl. ¶¶ 3, 4, 5, 740 P.2d 1058 [1987]).

Reimer & Koger cites *Ernest v. Faler*, 237 Kan. 125, 697 P.2d 870 (1985), for the principle that its claims are rights guaranteed by § 18 of the Kansas Constitution Bill of Rights and, therefore, are fundamental rights entitled to strict scrutiny. We rejected this same argument in *Clements v. United States Fidelity & Guaranty Co.*, 243 Kan. 124, 128, 753 P.2d 1274 (1988), wherein we stated: "Section 18 does not create rights of action; it only requires that Kansas courts be open and afford a remedy for such wrongs that are recognized by law." 243 Kan. at 128. Moreover, *Ernest* involved a vested right of action in tort for damages while in this case we do not deal with vested rights. Finally, as stated above § 18 of the Kansas Constitution Bill of Rights protection is not an absolute ban on abolishing certain common-law causes of action; to the contrary, it allows abolition as long as there is an adequate substitute remedy. Thus, § 18 protection does not, of itself, implicate equal protection concerns.

The rational basis test has traditionally been applied where equal protection challenges have been brought against social and economic legislation. Statutory limitations on liability and recovery have been held to be social and economic legislation. *Leiker v. Gafford*, 245 Kan. at 363. K.S.A. 1995 Supp. 74-4904a falls within this category as well, activating the rational basis test.

The rational basis test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. *Leiker v. Gafford*, 245 Kan. at 363. The Equal Protection Clause does not prevent the legislature from treating different claims of parties differently; a legislative classification will be upheld if the classification is rationally related to a legitimate legislative purpose. *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1017-18, 850 P.2d 773 (1993).

K.S.A. 1995 Supp. 74-4904a advances the legitimate legislative purpose of encouraging settlement between defendants in litiga-

tion with KPERS, particularly with respect to claims which accrued prior to July 1, 1987.

*Separation of Powers*

Reimer & Koger argues that K.S.A. 1995 Supp. 74-4904a violates the doctrine of separation of powers because it represents legislative assumption of judicial function, retroactively depriving it of vested rights. K.S.A. 1995 Supp. 74-4904a(4) provides for retroactive application by applying to any settlement judicially approved after the effective date of the statute regardless of the date on which KPERS suffered any injury, loss, or damage, or the date on which any claim or cause of action of KPERS arose or accrued.

"A statute will operate prospectively rather than retrospectively unless its language clearly indicates that the legislature intended the latter, and retrospective application will not be given where vested rights will be impaired." *Eakes v. Hoffman-LaRoche, Inc.,* 220 Kan. 565, Syl. ¶ 1, 552 P.2d 998 (1976).

In support of its position, Reimer & Koger relies upon *Davis, Administrator v. Union Pacific Railway Co.,* 206 Kan. 40, 476 P.2d 635 (1970), a case involving vested rights to real estate. However, in *Davis* the rights of the parties vested upon an individual's death prior to the enactment of the statute. Thus, a retroactive application of the statute impaired vested rights. Unlike *Davis,* Reimer & Koger's claims for contribution and noncontractual indemnity do not constitute vested rights.

As stated above, rights are vested when the right to enjoyment, present or prospective, has become the property of a particular person as a present interest. *Board of Greenwood County Comm'rs v. Nadel,* 228 Kan. at 473. "[A] mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right." 228 Kan. at 473-74. In *Nitchals v. Williams,* 225 Kan. 285, 590 P. 2d 582 (1979), we concluded that the event which brings into existence a personal injury protection carrier's right of reimbursement was the recovery of damages by the insured. 225 Kan. at 294; see *Resolution Trust Corp. v. Fleischer,* 257 Kan. at 365-68.

The retroactive application of K.S.A. 1995 Supp. 74-4904a(4) to Reimer & Koger's claims for contribution and noncontractual in-

demnity does not violate the doctrine of separation of powers because those claims are not vested rights, but consist of a mere expectancy of future benefits contingent on the anticipated continuation of preexisting laws.

Reversed.

ABBOTT, J. dissenting: I would affirm. While I disagree with much of the reasoning behind the majority opinion, I do not want to distract from the thrust of this dissent and will not nitpick the majority opinion. I would comment that this is not a case involving contribution between joint tortfeasors, and I am confused as to what part that erroneous conclusion plays in the majority opinion.

I dissent on the basis that due process is violated because a remedy to due course of law is denied, contrary to § 18 of the Kansas Constitution Bill of Rights. Here, the majority concludes § 18 of the Kansas Constitution Bill of Rights is not violated. Thus, the issue becomes whether there is a legitimate public purpose and an adequate quid pro quo. I would hold there is neither.

We are not dealing with broad policy decisions such as the legislature trying to make health care affordable and available to the general public or make insurance available to protect the public from injuries sustained in automobile accidents. Here, the legislature authorized a method of investing in or making loans of KPERS funds to entities that might otherwise not be able to obtain venture capital. When over $200,000,000 of KPERS funds were lost and numerous lawsuits filed, the legislature, at the request of those who wished to settle and be protected from other defendants who might have a legal right to look to that settling party for full recovery of any sum that the nonsettling defendants might ultimately be required to pay to KPERS, passed the statutes in question.

The sole purpose in passing the statutes was to protect the settling parties at the expense of the remaining defendants. There is no broad general purpose involved—only claims or causes of actions by KPERS are covered. It forces those who KPERS makes a claim against to either settle or lose their right to recover from a settling party who was required by law, at the time the act or acts

occurred, to recompensate the nonsettling party for its liability to KPERS. In other words, the statute requires potential defendants to settle first or bear all risks, thus denying them their day in court.

I take no comfort in what the majority finds as an adequate quid pro quo. There is no difference in what the majority is holding as an adequate quid pro quo than in this example: You, as an individual, guarantee a promissory note of a friend for $10,000. The friend defaults on the note and the lender makes demand on you and the friend. During the time period at issue in this example, the law was that if you are forced to pay the note, pursuant to its terms, there was an implied contract that your friend, who should have paid the note, will make you whole. If the legislature then enacted a similar statute to the one at issue in this appeal (which in our case at bar applies to only one lender or investor in the state) and your friend settled with the bank for $100 (and the court approved the settlement), you would have to pay $9,900 (or $10,000 less the $100). According to the majority opinion, you should be happy, even though you lost your right to go against your friend for his or her portion of the liability awarded against you ($9,900), because you received an adequate quid pro quo, *i.e.*, you received credit for the $100 your friend settled for.

The net effect of the statute is that KPERS's risk of settling for less than what is ultimately determined to be the settling defendants' share is shifted from itself to the remaining nonsettling defendants. The risk of the settling defendants paying more than what is determined to be the settling defendants' share had always been on the settling defendants and remains there under the statute at issue.

I see no benefit which this statute provides to the nonsettling defendants and would hold that it does not offer an adequate quid pro quo. I would affirm the trial court, albeit for a different reason.

ALLEGRUCCI and LARSON, JJ., join in the foregoing dissent.