The Honorable Dale A. Swenson State Representative, 97th District 3145 S. Fern Wichita, Kansas 67217
Dear Representative Swenson:
You request our opinion regarding the issue of whether the Kansas Tax Increment Financing statutes (K.S.A. 12-1770
et seq.) can be used to finance the construction of a golf course, as described in articles enclosed with your request. Because we do not act as fact finders when issuing formal opinions, we necessarily accept as accurate and complete the information provided in connection with an opinion request.
The two articles you provided were from the Wichita Business Journal, dated October 4, 1996, and the Wichita Eagle Beacon, dated March 25, 1997. The October 4, 1996, article reported that two developers approached the City of Wichita seeking tax increment financing to fund a public golf course. The developers proposed that they build houses in the $120,000 to $180,000 range in a "flat, treeless area" on the west side of Wichita, then use property taxes generated by the new housing to pay for the golf course. The March 25, 1997, article reported that a private developer is constructing a $16 million golf course south of Andover. The developer is planning to build approximately two hundred homes surrounding the golf course on one to five acre lots; the lots could each sell for $250,000 and many of the homes would cost $750,000. The lots are described as having "trees, lakes and other amenities." The issue raised in the article is whether the City of Andover can lawfully use "new property tax money" to pay off bonds which were used to finance street, sewer and water improvements in the proposed "exclusive housing development." This financing scheme is identified in the article as tax increment financing.
Although the two articles report on different proposed developments, both articles raise the same question you pose in your request: Do these areas meet the criteria for TIF redevelopment districts?
The Tax Increment Financing (TIF) Act was originally passed into law in the 1976 legislative session. L. 1976, Ch. 69, § 1. The stated purpose of the TIF Act was to "promote, stimulate and develop the general and economic welfare of the state of Kansas and its communities and to assist in the development and redevelopment of downtown areas of cities. . . ." The power of eminent domain was granted cities which exercise TIF authority. Id. at § 1. TIF powers could only be exercised by cities which had found that the "area sought to be redeveloped is a blighted area; and . . . the conservation, development or redevelopment of such area is necessary to promote the general and economic welfare of such city." Id. at § 2. The definition of "blighted area" survived all subsequent legislative changes and the language remains identical in K.S.A. 1996 Supp. 12-1771(a):
 "[B]lighted area means an area which, because of the presence of a majority of the following factors, substantially impairs or arrests the sound development and growth of the municipality or constitutes an economic or social liability or is a menace to the public health, safety, morals or welfare in its present condition and use. . . ." See also, L. 1976, Ch. 69, § 2.
The ten potential factors indicating blight include deterioration of structures or site improvements, unsanitary or unsafe conditions, excessive tax or assessment delinquencies, title defects and conditions which endanger life or property. Originally, only special obligation bond proceeds could be used to acquire real property, provide relocation assistance and pay for development of the site and related street and other expenses. Id. at § 4. The current statute permits financing through full faith and credit tax increment bonds or certain uncommitted funds to pay for these and other infrastructure improvements. K.S.A. 1996 Supp.12-1770, 12-1774.
The 1979 legislature changed the term "downtown" in the act's purpose to "central business district." L. 1979, Ch. 52, § 1. This change, as well as other amendments made during the 1979 session, prompted the Kansas Supreme Court to find the TIF Act to be constitutional. State, ex. rel. Schneider v. City of Topeka, 227 Kan. 115, 125 (1980).
The 1982 legislature added "enterprise zones" to "blighted areas" as the only other locality for which a redevelopment project could be undertaken and funded with tax increment financing. An enterprise zone was extensively defined in L. 1982, Ch. 75, § 7; in essence, no area could be found to be an enterprise zone unless the area had "widespread poverty, unemployment, and general distress" or certain other criteria dealing with high unemployment rates, low incomes or dwindling populations. Id. Currently, an enterprise zone can become a redevelopment district and benefit from tax increment financing only if its status was officially declared prior to 1992, with the possibility for limited enlargement of the area upon specific findings by the Secretary of Commerce and Housing. K.S.A. 1996 Supp.12-1771(a).
Environmentally contaminated territory, both within and outside of the city, was added to the list of possible redevelopment district areas in 1991 and 1994. L. 1991, Ch. 59, § 1, and L. 1994, Ch. 63, § 1. Finally, in 1996 the legislature omitted the term "central business district" from the stated purpose of the act and added, after the term "blighted areas," the phrase "deteriorating areas which are not yet blighted but may be so in the future." K.S.A. 1996 Supp. 12-1770. These deteriorating tracts were designated "conservation areas" (L. 1996, Ch. 228, § 2) and defined as "any improved area within the corporate limits of a city in which 50% or more of the structures in the area have an age of 35 years or more, which area . . ." is becoming blighted due to the presence of two or more of listed factors, such as dilapidation of structures, structures below code standards and inadequate infrastructure. K.S.A. 1996 Supp. 12-1771(a).
Amendments to the Act which failed to pass the 1997 session included adding to the list of potential redevelopment districts "residential development area [which] is necessary for the sound community growth" in any "substantially open land" (House Bill No. 2179) and "major tourism areas within and without cities" (House Bill No. 2349).
"The fundamental rule of statutory construction to which all others are subordinate is that the intent of the legislature governs." KPERS v. Reimer Assocs., Inc., 261 Kan. 17, 26 (1996). The Court further stated in KPERS: "[I]n attempting to discover legislative intent, as it relates to a statute, we are not bound to an examination of the language alone but may look into existing conditions — the causes which impelled its adoption and the objective sought to be obtained." Id.
It is our opinion that the two private developments described in the articles you provided do not satisfy legislative intent for using tax increment financing as reflected in the language, historical background and purpose of the TIF Act. First, in the Act's stated purpose three of the areas intended for TIF assistance are characterized by unsafe and/or economically unsound conditions; the fourth stated purpose is to assist development in environmentally contaminated areas. The two newspaper articles make no reference to any preexisting problems in either property; in fact, the natural beauty and benefits of the areas are described. Secondly, the Act's definitions of "blight" and "conservation area" preclude any property from becoming a redevelopment district unless it contains multiple physical or economic deficiencies; again, no such factors are present in the real estate at issue. There is likewise no indication that either property was designated an "enterprise zone" prior to 1992 to qualify under the third prerequisite for a TIF redevelopment district.
Lastly, through all historical changes, the legislative intent expressed in the Act is to assist cities in funding (re)development to areas with existing social, economic or physical distress for the general welfare of the public. Nothing in the language or historical context of the Act enables open countryside, with no preexisting deficiencies, to benefit from tax increment financing, and thereby realize a loss to the local tax base and provide an advantage to owners of exclusive housing. The only legislative reference to any such area in the TIF Act was in a bill that failed to pass in the 1997 session.
In our opinion, the tax increment financing laws cannot be used to fund a golf course adjoining an undeveloped residential area or street, sewer and water improvements for a housing development where neither area meets the criteria for a redevelopment district.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Nancy L. Ulrich Assistant Attorney General
CJS:JLM:NLU:jm