The Honorable Kent Glasscock State Representative, 62nd District P.O. Box 37 Manhattan, Kansas 66505
Robert J. Watson Overland Park City Attorney 8500 Santa Fe Drive Overland Park, Kansas 66212
Dear Speaker Glasscock and Mr. Watson:
You request our opinion regarding the juvenile intake and assessment process in Johnson County. You indicate that the Johnson County Board of County Commissioners has contracted with Temporary Lodging for Children, an independent contractor, to provide intake and assessment services to juveniles who have been arrested, as well as children taken into custody who appear to be in need of care. Your concerns with the juvenile intake and assessment process lie in the area of the Fourth, Fifth, Sixth, andFourteenth Amendments to the United States Constitution, and the constitutional right to privacy. Before addressing your specific questions, it is helpful to examine the history of the juvenile intake and assessment process.
 BACKGROUND
Prior to 1994, there was no statutory process to evaluate minors who were detained by law enforcement as possible juvenile offenders or children-in-need-of-care. A juvenile would enter the system through contact with law enforcement or upon receipt of a summons to appear in court.[1] In most instances, information concerning the juvenile was limited to that received upon arrest through police intake procedures.[2]
After arrest, the juvenile could be detained in a juvenile detention facility pending a court appearance.[3] Once the county or district attorney received the law enforcement report, the prosecutor would determine what charges, if any, to file against the juvenile.[4]
This lack of a comprehensive method to assess and evaluate juveniles prior to their entering the system, as well as other problems in the juvenile offender system, served as the impetus for the Legislature's creation of the Criminal Justice Coordinating Council in 1994.[5]
Council members included the Governor, the Chief Justice of the Kansas Supreme Court, the Attorney General, the Secretary of Corrections, the Secretary of the Kansas Department of Social and Rehabilitation Services (SRS) and the Director of the Kansas Bureau of Investigation.[6] One of the Council's tasks was to make recommendations regarding the juvenile intake and assessment process. The Kansas Supreme Court was also allocated funds to develop a "uniform, standardized program for juvenile intake and assessment developed in consultation with" SRS.[7]
In November, 1995, the Koch Crime Commission's Juvenile Justice System Task Force (Task Force) issued its report on the juvenile justice system and recommended changes in the area of assessment of juveniles. The Task Force found that the juvenile justice system was overburdened by an ever-growing number of cases created by a substantial increase in arrests of juveniles between the ages of 10 and 14. Moreover, the Task Force noted that 80% of the juveniles who appeared in court were either first time offenders or had only one prior contact with the court system.[8]
To stem the tide of cases, the Task Force concluded that a comprehensive intake and assessment system should be devised for the purpose of redirecting "first time and less serious offenders":
 "The establishment of a comprehensive system for intake and assessment would provide for early identification of at-risk behavior in juveniles and thus allow for appropriate services to be offered immediately. In addition, accurate information could provide a management tool to identify gaps in service and program needs, thus assisting local communities and the State in developing needed options for juvenile offenders."[9]
During the time the Task Force was gathering information for its report, the Kansas Supreme Court was developing a statewide system of juvenile intake and assessment pursuant to the Legislature's 1994 mandate.
The system adopted by the Court is modeled on the Juvenile Assessment Center in Tampa, Florida.[10] The process begins when a law enforcement officer arrests a juvenile suspect or takes custody of a child believed to be in need of care.[11] The officer transports the juvenile to an intake and assessment worker who then administers an intake questionnaire that addresses prior police/court involvement, school information, substance abuse history, youth or family psychological treatment history, gang involvement, economic situation and victimization history.[12] The other component of the process is an assessment tool — the Problem Oriented Screening Instrument for Teenagers (POSIT) — designed by the National Institute on Drug Abuse.[13] The POSIT consists of 139 "yes" or "no" questions that delve into the behavior and activities of a juvenile. After the POSIT questionnaire is completed, it is scored and the juvenile's parents or guardians are advised of the results.[14] The POSIT "score" is determined by comparing the youth's answers to a norm obtained from a diverse sample. If the answers fall above a specified cut-off level, a potential problem area is identified.[15] The POSIT does not diagnose; it merely indicates that further assessment may be necessary.[16]
On February 21, 1995, the Kansas Supreme Court adopted Administrative Order No. 97 to implement this juvenile intake and assessment system for children in need of care and juvenile offenders.
The Order requires administrative judges to ensure that a juvenile intake and assessment program is established for the judicial district. The Order also creates standards for local programs, and requires use of the POSIT assessment tool.[17] Local programs are prohibited from making "recommendations regarding the prosecution of juvenile offenders or the filing of petitions for children in need of care."[18] Pursuant to the Kansas Supreme Court Order, the Johnson County District Court issued its administrative order[19] establishing the intake and assessment process.
In 1996, the Legislature, in essence, codified the Kansas Supreme Court's Administrative Order by enacting K.S.A. 2000 Supp. 75-7023
requiring the Supreme Court to establish a juvenile intake and assessment system. Presently, through a Memorandum of Understanding between SRS and the Juvenile Justice Authority (JJA), children in need of care are also subject to intake and assessment pursuant to the Kansas Supreme Court Administrative Order.
K.S.A. 2000 Supp. 75-7023 also provides, in part:
 "(b) No records, reports and information obtained as a part of the juvenile intake and assessment process may be admitted into evidence in any proceeding and may not be used in a child in need of care proceeding except for diagnostic and referral purposes and by the court in considering dispositional alternatives. . .
 "(c) Upon a juvenile being taken into custody . . . a juvenile intake and assessment worker shall complete the intake and assessment process as required by supreme court administrative order or district court rule . . .
 "(d) Except as provided in subsection (g) . . . and in addition to any other information required by the supreme court administrative order, the secretary [of SRS], the commissioner [of JJA] or by the district court of such district, the juvenile intake and assessment worker shall collect the following information:
 "(1) A standardized risk assessment tool, such as the problem oriented screening instrument for teens [POSIT];
 "(2) criminal history, including indications of criminal gang involvement;
"(3) abuse history;
"(4) substance abuse history;
 "(5) history of prior community services used or treatments provided;
"(6) educational history;
"(7) medical history; and
"(8) family history."[20]
After completion of the intake and assessment process, the intake and assessment worker may release the juvenile to a parent or guardian, conditionally release the juvenile to a parent or guardian, or deliver the juvenile to a shelter facility. Conditions of release may include counseling or accessing community services that would benefit the juvenile or the family.[21] The intake and assessment worker can also make recommendations to the county or district attorney concerning immediate intervention programs that may benefit the juvenile.[22]
In addition to K.S.A. 2000 Supp. 75-7023's prohibition against the use of intake and assessment information as evidence in any proceeding, the information cannot be disclosed to any person or organization unless authorized by statute[23] or court rule.[24]
With this background in mind, we now turn to the example that will be used as the basis for your legal questions: A 13 year old student is arrested for disorderly conduct or some similar criminal offense committed at school.[25] The student is transported to the Johnson County Juvenile Intake and Assessment Center (JIAC). It is the student's first encounter with law enforcement. The student is given a sheet of paper entitled "What to Expect While You Are At The Juvenile Intake and Assessment Center" and stating, in part:
 "You are at the [JIAC] because you have been accused of committing an offense or because you have been identified as a Child In Need of Care. JIAC was created to help youths and their families, help law enforcement, and help the court. Information that is gathered here will be included in a report that will be shared with court officials, and may be shared with any agency providing services to you. Your decision to share information with JIAC staff is voluntary. Under Kansas law, information provided at JIAC cannot be used as evidence against you in a criminal case.
 "JIAC has the authority to make decisions as to whether you will return home or are in need of another placement. You will probably be in our custody for at least two hours. Your cooperation and patience are appreciated. Behavior that puts the security of this building, the staff, or other youths at risk may result in your placement at the Juvenile Detention Center.
 "While You Are Here, You Can Expect These Things to Happen:
 "[An] immediate call will be made to your parents or guardians, and you will be given the opportunity to speak to them. If they are not immediately available, further attempts will be made to contact them. If you want to speak with an attorney, or if your parents want you to speak to an attorney, then you will be given that opportunity.
 "If you are over 13 years old, then you will be asked to complete a `yes' or `no' survey. This survey helps us identify concerns that your behaviors or thoughts may show.
 "A counselor will talk with you and ask you questions that might help us develop a more complete understanding of you. Some things that may be talked about are: your strengths, family history, school history, employment history, health, substance abuse history, treatment history, participation in extracurricular activities, and other important experiences in your life. You will not be questioned about the arrest incident.
 "After the counselor is done talking with you, the results of your survey will be shared with you. The counselor will speak with you about your strengths and any concerns that were identified. If needed, the counselor may help you identify solutions.
 "If possible, the counselor will also speak to, or meet with, your parents or guardians. You and your family will be given information about court. If your family wants to know where to get help for any concerns, more information will be given."[26]
 DISCUSSION
It appears that your concerns are focused around the POSIT questions, the fact that information gathered by JIAC workers may be used by the district attorney to make charging decisions, and the fact that the information is stored in the juvenile offender information system maintained by the Kansas Bureau of Investigation (KBI).
Specifically, one or both of you pose the following questions:
 1. "Does the Sixth Amendment . . . afford a juvenile the right to consult with an attorney prior to participation in, or a right to have counsel present during the juvenile intake and assessment process?"
The Sixth Amendment provides that "[in] all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."[27] In the case of In re Gault,[28] the United States Supreme Court concluded that the Due Process Clause of theFourteenth Amendment to the United States Constitution requires that a juvenile be advised of this right to counsel "in respect to proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed."[29] This right is codified at K.S.A. 38-1606 which provides that a juvenile "charged under this code is entitled to the assistance of counsel at every stage of the proceedings."
However, in the scenario presented, while the juvenile has been arrested, he has not been charged with an offense. The right to counsel attaches "only at or after the initiation of adversary judicial proceedings" and to certain "critical" pretrial proceedings:[30]
 "Although we have extended an accused's right to counsel to certain `critical' pretrial proceedings . . . we have done so recognizing that at those proceedings, `the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both,' . . . in a situation where the results of the confrontation `might well settle the accused's fate and reduce the trial itself to a mere formality.' [We] have never held that the right to counsel attaches at the time of arrest."[31]
The Kansas Supreme Court has found that, in the absence of criminal charges, there is no Sixth Amendment right to counsel at the investigative stage of a prosecution even if the person is the target of the investigation.[32] Therefore, it is our opinion that theSixth Amendment right to counsel does not attach at the point when a juvenile is taken into custody and subjected to the juvenile intake and assessment process.
 2. "Assuming that the juvenile suspected of committing a crime or of being a child-in-need-of-care feels compelled to answer POSIT questions related to possible criminal activity, such as drug use, does the compelling of responses infringe upon the juvenile's privilege against self-incrimination in violation of the Fifth Amendment?"
The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any Criminal Case to be a witness against himself." The privilege applies in the same way to juveniles as it does with respect to adults.[33] The mechanism by which theFifth Amendment is enforced is by excluding from trial "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination":[34]
 "The Fifth Amendment itself does not prohibit all incriminating admissions; `absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.' [Citation omitted.] The Miranda Court, however, presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights.
The prophylactic Miranda warnings therefore are `not themselves rights protected by the Constitution but are instead measures to insure that the right against compulsory self-incrimination is protected.' [Citation omitted.]"[35]
In our example, when a juvenile is taken to a juvenile intake and assessment center, the juvenile is not free to leave, and, therefore, is "in custody" for purposes of the Fifth Amendment.[36] We are also asked to assume that even though the juvenile is advised in writing that he or she does not have to provide information and that any information provided cannot be used as evidence in a criminal case, the juvenile feels compelled[37] to answer the POSIT questions.[38]
While it may not have been the intent of the creators of the POSIT questionnaire to "elicit incriminating responses"[39] from a juvenile, several of the queries do relate to criminal activity,[40] thus raising the specter of the Fifth Amendment if the answers to those questions are used against the juvenile in a subsequent criminal proceeding.[41] The fact that the interrogator is not a law enforcement officer does not assuage Fifth Amendment concerns.
In Estelle v. Smith,[42] the Court concluded that statements made by the defendant to a psychiatrist appointed by the trial court to determine the defendant's competence to stand trial were not admissible when the prosecution called the psychiatrist to testify at the penalty phase of a capital murder trial on the issue of the defendant's propensity to commit criminal acts that would constitute a continuing threat to society:
 "That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer . . . is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. During the psychiatric evaluation, respondent assuredly was `faced with a phase of the adversary system' and was `not in the presence of [a] person acting solely in his interest.'"[43]
In the scenario presented to us, there is no mention of whether a juvenile's "yes" or "no" answers to the POSIT questionnaire will ever be used in a subsequent criminal proceeding. Moreover, K.S.A. 2000 Supp.75-7023(b) prohibits any "records, reports and information obtained as part of the juvenile intake and assessment process" from being "admitted into evidence in any proceeding." The Kansas Supreme Court Administrative Order prohibits JIAC programs from making "recommendations regarding the prosecution of juvenile offenders." The Johnson County District Court Order prohibits the use of the information gathered during the assessment in adjudicatory hearings. For the purpose of this question, we assume that POSIT responses have not been used in violation of K.S.A. 2000 Supp. 75-7023 or the Court Orders.
In Deshawn E. v. Safir,[44] the New York City Police Department formed a Juvenile Crime Squad. At some point, after a juvenile had been released following an arrest, the juvenile would return with the parent to be questioned by the Juvenile Crime Squad. The Squad would interview the juvenile about the crime the juvenile was alleged to have committed as well as other unsolved crimes. While the prosecutor was not statutorily precluded from using the statements made by the juvenile during these interviews, no statements had been used in any hearings at the point in time when juveniles and their parents filed a civil rights lawsuit seeking declaratory and injunctive relief against the Squad's interrogations, which plaintiffs characterized as coercive and violative of their Fifth Amendment rights.
The Second Circuit Court of Appeals, citing New York v. Quarles,[45]
concluded that a defendant does not have a constitutional right to receive Miranda warnings and that the remedy for the plaintiffs was not a civil rights action but, rather, a suppression hearing in the event the prosecution attempted to use the juvenile's statements.
Moreover, the fact that the prosecutor had announced his intention to use the statements taken by the Squad was not sufficient to trigger aFifth Amendment violation absent an actual attempt to use the statements. Therefore, absent use of the juvenile's responses to the POSIT questionnaire as evidence in a criminal or adjudicatory proceeding, we find no violation of the juvenile's Fifth Amendment rights.
 3. "Assuming that a juvenile feels compelled to answer POSIT questions, does the possibility that a prosecutor will use those answers to determine whether to refer the matter to youth court, file charges, or offer diversion, violate the juvenile's Fifth Amendment privilege against self-incrimination? If a court uses the information during the sentencing phase, would such use violate the Fifth Amendment?"
As indicated in our response to the preceding question, K.S.A. 2000 Supp. 75-7023(b), as well as the Kansas Supreme Court and the Johnson County District Court Administrative Orders, limit the use of information gathered during the intake process. However, the Johnson County District Court Administrative Order provides, in part:
 "The assessment is designed to aid the family in obtaining services, to provide information for use in making charging and placement decisions, and to assist the court in making disposition orders.
 "Information gathered in the intake process may be used in making charging decisions, but may not be used during the adjudicatory hearing." (Emphasis added.)
The Fifth Amendment privilege can be asserted in "any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory" if a witness "reasonably believes that [a disclosure] could be used in a criminal prosecution or could lead to other evidence that might be so used."[46] The fact that there may be some indirect or derivative use of the responses to POSIT questions addressing criminal behavior raisesFifth Amendment self-incrimination concerns if such use "leads to the infliction of criminal penalties."[47]
In Albertson v. Subversive Activities Control Board,[48] members of the Communist Party refused to comply with the United States Attorney General's order to register pursuant to federal law on the ground that the order violated their Fifth Amendment privilege against self-incrimination. The United States Supreme Court agreed that to register would expose the petitioners to criminal prosecution for being members of the Communist Party.
Moreover, the information could also be used to "supply investigatory leads to criminal prosecution,"[49] which, the Court concluded, is a use that is precluded by the privilege. In Kastigar v. United States,[50]
the Court upheld a federal statute that conferred immunity from use of any compelled testimony, as well as evidence derived from that testimony in a subsequent criminal proceeding.
The stated purpose of the POSIT is to help the juvenile and the juvenile's family by identifying potential at-risk behavior. Presumably, the juvenile and the juvenile's family are directed to community services that will address the behavior. The juvenile is assured that the information that he or she is providing will not be used against the juvenile in a criminal case. Therefore, use of POSIT responses to criminal behavior queries in a manner that is contrary to the seemingly benevolent purpose of the POSIT may run afoul of the rationale inAlbertson and Kastigar. Consequently, if such responses lead to the filing of criminal charges for which the juvenile was arrested, or for any other crime, there likely are Fifth Amendment implications.[51]Fifth Amendment problems will likely also exist if a court imposes a harsher sentence as a result of reviewing criminal behavior responses to POSIT queries. Because the scenario provided to us does not contain specific information regarding the manner in which a particular POSIT response is used, we cannot address whether the Fifth Amendment is violated in the scenario provided to us.
 4. "Does posing questions such as, `have you ever had sexual intercourse without using a condom' to a juvenile under the circumstances as we have assumed them to be, or to a juvenile in custody by reason of being suspected of being a child-in-need-of-care violate the juvenile's constitutional right to privacy?"
While the Constitution does not explicitly establish a right of privacy, the United States Supreme Court has recognized for nearly 100 years that a right of personal privacy does exist.[52] In a series of cases, the Court established a zone of privacy protected by the penumbra of a variety of provisions in the Constitution.[53]
One aspect of privacy that the courts have recognized is "the individual interest in avoiding disclosure of personal matters,"[54] an interest that a juvenile may have when questioned by a JIAC worker concerning the juvenile's sexual practices.
In Whalen v. Roe,[55] patients and physicians challenged a New York statute that required physicians prescribing certain controlled substances to provide to the State of New York a copy of every prescription on the grounds that the statute violated the privacy rights of patients because the prescription form identified the patient. The Court, after examining the means used to protect the disclosure of the information from the general public, concluded that requiring disclosure to state workers who were responsible for the health of the community did not amount to an invasion of privacy.
In Skinner v. Railway Labor Executives' Assn.,[56] the Court concluded that requiring a railway worker to complete a form that inquired whether the worker had taken any medications during the preceding 30 days did not amount to a "significant invasion of privacy" because the government treated the information as confidential and only used it to ascertain whether a positive drug test could be explained by an employee's use of medication.[57]
Finally, the 10th Circuit Court of Appeals has concluded that collection of private information by the government "may take place in circumstances where unwarranted disclosure of the information to others is avoided and important governmental interests are involved."[58]
All JIAC records are confidential and are disclosed only to certain persons identified in the statutes.[59] Moreover, while K.S.A. 38-1617et seq. create a central repository of juvenile offender information within the KBI, the KBI has advised that it does not collect POSIT questionnaires and responses.[60]
Even if the KBI did collect this information, all juvenile offender information located in the central repository is confidential and can be disseminated only to certain individuals and entities.[61] Therefore, it is doubtful that a court, applying the rationale of Whalen and its progeny, would find a violation of a privacy right.
Moreover, a state's authority over children's activities is broader than over similar actions by adults.[62] The POSIT questionnaire is a standardized risk assessment tool that is statutorily mandated.[63] The POSIT questionnaire's purpose, as previously indicated, is to "provide for early identification of at-risk behavior . . . and thus allow for appropriate services to be offered immediately."[64] It is our opinion that the courts would determine that the State of Kansas has an important governmental interest in identifying at-risk behavior[65] in juveniles that would justify this intrusion into a juvenile's personal life.[66]
While some individuals may be concerned that a question inquiring about personal sexual practices is asked of a teen who has been arrested for a minor offense and has had no prior involvement with the law, given the State's parens patriae interest and the fact that POSIT responses are confidential, the present state of the law would most likely not support a claim of a violation of a constitutional right of privacy under the scenario presented. However, to further insulate the process from attack on these grounds, the Juvenile Justice Authority may want to consider developing standards that would guide JIAC workers in determining when administration of the POSIT is appropriate.[67]
 5. "Does posing questions such as, `Do your parents/guardians argue a lot?' under the circumstances we have assumed them to be [i.e. juvenile arrested for disturbing the peace/no prior involvement with law enforcement] violate the parents' constitutional right of privacy?"
Our response to the preceding question is equally applicable here. However, we also consider the familial right of association, which is a substantive due process right protected by the Fourteenth Amendment.[68]
This right, consonant with the right of privacy,[69] protects family relationships from intrusion by the State. Arguably, that interest may be implicated in the scenario presented on the basis that the State is inserting itself into the relationship between a child and the child's parents by virtue of POSIT questions that delve into familial relations.[70]
In Griffin v. Strong,[71] a wife whose husband was the subject of a child abuse investigation brought a civil rights action against a police officer for violating her familial association rights when the officer told the wife, falsely, that her husband had confessed to child abuse.
The Court applied a balancing test weighing the state's interest in investigating reports of child abuse with the wife's interest in her familial right of association with her husband. Ultimately, the Court concluded that those interests must be examined in light of the facts of the particular case:
 "Not every statement or act that results in an interference with the rights of intimate association is actionable. Rather, to rise to the level of a constitutional claim, the defendant must direct his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship.
 "[We] also examine the evidence to determine the severity of the alleged infringement, the need for the defendant's conduct, and any possible alternatives. First, both Dorothy and Steven Griffin consensually talked to the police officer. Consensual interviews are less likely to infringe on familial relationships because the parties can always decline to talk. Second, there is no evidence . . . that the conduct going to Dorothy Griffin's familial rights of association claims involved physical coercion or conduct that shocks the conscience. (Citations omitted.)"[72]
The Court concluded that, despite the fact that the officer lied to the wife, the infringement of the plaintiff's familial rights of association were "slight."[73]
As indicated in the Griffin case, whether or not a parent's familial association rights are violated based on a juvenile's responses to a POSIT questionnaire will depend upon the facts[74] and, therefore, we offer no opinion regarding whether a parent would have a viable cause of action for violation of familial association rights.
 6. "Does the fact that information regarding criminal, family, physical abuse, substance abuse, educational, mental and medical histories elicited during the juvenile intake and assessment process is entered into a database and maintained for an indefinite period regardless of whether charges are filed or a child-in-need-of-care proceeding is instituted, violate the juvenile and/or family member's constitutional privacy rights?"
In Whalen v. Roe,[75] the United States Supreme Court upheld New York's program of recording in a centralized computer file the names and addresses of patients who had obtained, pursuant to a doctor's prescription, certain drugs for which there was both a lawful and unlawful market. The information was provided, on a form, by the prescribing physician to the State Department of Health where it was sorted, coded, and logged before being recorded on magnetic tapes for processing by computer. The forms were retained for five years and then destroyed. The computer tapes containing the data were kept in a locked cabinet. Public disclosure of the patients' identity was prohibited by statute and regulation. Willful violation of the disclosure prohibition was a crime punishable by up to one year in prison and a $2000 fine. While the Court noted the "threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive governmental files," the Court concluded that the record established no violation of a right to privacy:
 "The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. [New] York's statutory scheme . . . evidences a proper concern with, and protection of, the individual's interest in privacy. We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data . . . by a system that did not contain comparable security provisions."[76]
As we indicated in our response to Question No. 4, all of the information obtained through the intake and assessment process is confidential and is to be disclosed only to certain authorized individuals.[77] Moreover, we have no information[78] regarding how this data is collected and whether it is being compiled for statistical purposes or whether the data identifies each juvenile. Finally, the fact that this information is allegedly kept for an "indefinite period" would be only one factor among many that a court would consider in determining whether the JIAC process "evidences a proper concern with . . . the individual's interest in privacy."
 7. "Assuming that the juvenile feels compelled to answer the POSIT questions by the behavior and statements of the JIAC personnel, and assuming that the juvenile is led to believe that he will not be permitted to leave until finishing the POSIT, does the asking of the POSIT questions, that are unrelated to the disorderly conduct incident, constitute an unreasonable seizure in violation of the Fourth Amendment?"
An argument in support of a Fourth Amendment violation is that a juvenile is "seized" under a Terry v. Ohio[79] theory and is then subjected to questioning that is not reasonably related in scope to the circumstances that justified the interference in the first place. A concern raised by Councilmember Kris Kobach[80] is that the seizure violates the Fourth Amendment because the questioning regarding sexual practices is not related to the arrest for disorderly conduct.
In Terry, the United States Supreme Court scrutinized a street confrontation between a citizen and a police officer investigating suspicious circumstances. At issue was the "quite narrow question . . . whether it is always unreasonable for a policeman to seize a person and subject him to a search for weapons unless there is probable cause for an arrest:"[81]
 "The distinctions of classical `stop-and-frisk' theory thus serve to divert attention from the central inquiry under the Fourth Amendment-the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. `Search' and `seizure' are not talismans. We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a `technical arrest' or a `full-blown search.'
 "In this case there can be no question, then, that Officer McFadden `seized' petitioner and subjected him to a `search' when he took hold of him and patted down the outer surfaces of his clothing. We must decide whether at that point it was reasonable for Officer McFadden to have interfered with petitioner's personal security as he did. And in determining whether the seizure and search were `unreasonable' our inquiry is a dual one-whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[82]
The Court concluded that where a police officer has reason to believe that the officer is dealing with an armed and dangerous individual, a reasonable search for weapons for the protection of the officer is warranted, regardless whether the officer has probable cause to arrest the individual for a crime.
We do not believe that a Terry analysis is appropriate for our scenario. In Terry, the Court was concerned about law enforcement's ability to detain and search an individual on less than probable cause. In the situation we have been asked to address, that concern is not present because presumably there is no issue of the existence of probable cause — the juvenile has been arrested for disorderly conduct or some similar offense.
Aside from the Terry argument, the Fourth Amendment only prohibits unreasonable searches and seizures. Whether that reasonableness standard is met is determined by "balancing the intrusion on the individual'sFourth Amendment interests against its promotion of legitimate governmental interests."[83] While a juvenile who has been arrested for disorderly conduct may consider it intrusive to answer a question regarding sexual practices, a court could determine that, in light of the government's interest in identifying at-risk behavior in juveniles, this limited intrusion is justified and does not run afoul of theFourth Amendment.
 8. "Would the answer to any of the foregoing seven questions change if the disorderly conduct incident had occurred in the Oak Park Mall Shopping Center rather than the school, but the juvenile subsequently had been subjected to the same JIAC procedures?"
Our answers are the same regardless of the location of the arrest. K.S.A. 38-1624(a) authorizes a law enforcement officer to take a juvenile into custody for a variety of reasons listed in the statute.[84] When a law enforcement officer takes an alleged juvenile offender into custody, the officer must take the juvenile to an intake and assessment worker.[85] The JIAC worker is then required to complete the intake and assessment process.[86]
 9. "Would the answer to any of the foregoing eight questions change in light of the fact that under adult sentencing guidelines, juvenile court convictions are comparable to adult convictions and can be used in determining the sentence for a subsequent adult conviction?"
When determining an adult offender's criminal history for purposes of sentencing, some juvenile adjudications are considered which could have an effect on the type of sentence imposed.[87] Depending upon the circumstances, an adult offender could attempt to challenge a juvenile adjudication on a variety of theories. However, the fact that an offender could challenge such an adjudication on the grounds put forth in the questions does not change our answers.
 10. Would a juvenile court prosecution stemming from a charging decision based upon information derived from answers to the POSIT run afoul of the Equal Protection Clause where an adult charged with the same crime is offered diversion?
The United States Supreme Court has described the concept of equal protection as treatment between classes of individuals whose situations are arguably indistinguishable. Whether the difference in treatment passes constitutional muster depends on the relationship borne by the challenged classification to the objective sought by its creation.[88]
In analyzing an equal protection claim, the first step is determining which level of scrutiny to apply where a statute or process distinguishes between classes of individuals.[89]
The "rational basis" test is applied where equal protection challenges are brought against social and economic legislation, as in the case here.[90] Under the "rational basis" test, a classification must bear a rational relationship to a legitimate objective:[91]
 "The rational basis test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. The state legislature is presumed to have acted within its constitutional power, even if the statute rests in some inequality. Under the rational basis test, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."[92]
Assuming that a juvenile charged with burglary and an adult charged with burglary are in the same classification for equal protection purposes, it is our opinion that the difference in treatment is rationally related to a legitimate governmental objective.
First, the State treats differently juveniles and adults who are arrested for crimes because of the state's parens patriae tradition and a juvenile's lack of legal capacity.[93] While the Fourteenth Amendment is not for adults alone,[94] many jurisdictions grant certain rights to adults which are withheld from juveniles.[95]
Secondly, one of the goals of the juvenile justice code is to rehabilitate a juvenile offender.[96] In In re T.A.L,.[97] a juvenile challenged, on equal protection grounds, a statute that allowed the State to move for an upward departure of the statutorily prescribed minimum term of confinement but prohibited the sentencing court from reducing the minimum term:
 "There is a rational basis for the legislature's refusal to allow juveniles to petition for downward departure. A goal of the juvenile justice code is to rehabilitate juvenile offenders. The Kansas Legislature has determined that this rehabilitation goal may best be served by commitment of a juvenile offender to a minimum term in the juvenile correctional facility, based on the offense . . . committed. Conversely, if the State or sentencing court believes that rehabilitation can be achieved by extending the minimum term of commitment to a juvenile correctional facility, then an upward departure could be sought. The legislature's provision of an upward departure without the allowance of a downward departure is rationally related to rehabilitation."[98]
Assuming that a prosecutor reviews the POSIT responses and determines that a juvenile would not benefit from an immediate intervention program,[99] including diversion, we see no Equal Protection Clause violation simply because that same prosecutor would offer diversion to an adult charged with the same crime. Moreover, before a prosecutor can offer diversion to an adult, the prosecutor must determine whether diversion "is in the interests of justice and of benefit to the defendant."[100] Presumably, this determination is based on factors that are similar to whether a juvenile will benefit from an immediate intervention program.
 CONCLUSION
Summarizing, The Sixth Amendment right to counsel does not attach at the point when a juvenile is taken into custody and subjected to the juvenile intake and assessment process established pursuant to K.S.A. 2000 Supp. 75-7023.
Whether a juvenile's Fifth Amendment rights are violated will depend upon whether a juvenile is in fact compelled to respond to a POSIT questionnaire and whether there is an attempt to use such responses against the juvenile in a criminal proceeding. There would likely beFifth Amendment implications if POSIT responses to criminal behavior queries lead to either the filing of criminal charges or the court's imposition of a harsher sentence based on such responses.
Given the State's parens patriae interest and the fact that POSIT questionnaire responses are confidential, it is unlikely under the present state of the law that a claim based upon the constitutional right of privacy would be successful.
Although the fact that the information obtained during the intake and assessment process is allegedly retained indefinitely, it is only one of many factors that a court would consider in determining whether the intake and assessment process evidences a proper regard for privacy.
Whether or not a parent's familial association rights are violated based on a juvenile's responses to a POSIT questionnaire will depend upon the facts of the case.
While a juvenile who has been arrested for disorderly conduct may consider it intrusive to answer a question regarding sexual practices, in light of the government's interest in identifying at- risk behavior in juveniles, this limited intrusion is justified and does not run afoul of the Fourth Amendment.
Finally, the fact that responses to a POSIT questionnaire may be taken into account by a prosecutor in determining whether to grant diversion does not implicate the Equal Protection Clause.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Mary Feighny Assistant Attorney General
CJS:JLM:MF:jm
[1] Koch Crime Commission Juvenile Justice System Task Force,Recommendations on Changes to the Juvenile Justice System in Kansas 3 (November, 1995).
[2] Id.
[3] Id.
[4] Id. at 5.
[5] L. 1994, Ch. 315, § 1(g). This provision has since been repealed. L. 1997, Ch. 156, § 87.
[6] Id. at § 1(b).
[7] L. 1994, Ch. 360, § 6.
[8] Koch Crime Commission, supra, note 1, at 6.
[9] Id. at 10.
[10] Koch Crime Commission General Counsel Division, Juvenile JusticeResearch Project 3 (April, 1996).
[11] Id.
[12] Id. at 5-6.
[13] Id. at 5.
[14] Id. at 7.
[15] Id.
[16] Id.
[17] Supreme Court Administrative Order No. 97, § 6(a).
[18] Id. at 2.
[19] Johnson County Administrative Order No. 6.
[20] K.S.A. 2000 Supp. 75-7023 (emphasis added).
[21] K.S.A. 2000 Supp. 75-7023(e).
[22] Id.
[23] K.S.A. 38-1507 (child-in-need-of-care); K.S.A. 38-1608(e) (juvenile offenders).
[24] Kansas Supreme Court Administrative Order No. 97; Johnson County District Court Administrative Order No. 6.
[25] This opinion does not address the propriety of the arrest itself. For our purposes, we assume that the juvenile is in custody pursuant to K.S.A. 38-1624.
[26] "What to Expect While You Are At The Juvenile Intake and Assessment Center" (emphasis added). The survey referenced in this document is the POSIT.
[27] Estelle v. Smith, 451 U.S. 454, 469, 101 S.Ct. 1866,68 L.Ed.2d 359 (1981).
[28] 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[29] 18 L.Ed.2d at 554. Gault does not address "the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process."
[30] United States v. Gouveia, 467 U.S. 180, 188-189,104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).
[31] Id. at 189-190. (emphasis added.) See Illinois v. Perkins,496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), (in the absence of criminal charges being filed, the 6th Amendment right to counsel does not attach).
[32] State v. Waugh, 238 Kan. 537 (1986).
[33] In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[34] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[35] New York v. Quarles, 467 U.S. 649, 654, 81 L.Ed.2d 550,104 S.Ct. 2626 (1984).
[36] California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517,77 L.Ed.2d 1275 (1983).
[37] See Ohio Adult Parole Authority v. Woodward, 532 U.S. 272,118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), (pressure on inmate to answer questions in a clemency interview did not make the inmate's testimony "compelled" for Fifth Amendment purposes).
[38] The JIAC instructions provide that if the juvenile is "over 13 years old" he will be asked to respond to the POSIT queries. Because the juvenile in our example is 13 years old, this juvenile would, presumably, not be subjected to the POSIT.
[39] See Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297(1980) (`interrogation' includes express questioning and any "words or actions . . . reasonably likely to elicit an incriminating response.")
[40] "Have you stolen things?" "Have you ever threatened anyone with a weapon?" "Have you had a car accident while high on alcohol or drugs?"
[41] In the Matter of B.M.B., 264 Kan. 417 (1998) (an in-custody statement given by a juvenile under the age of 14 cannot be used against the juvenile at a subsequent hearing where the juvenile was not given an opportunity to consult with a parent or attorney regarding a waiver of the right against self-incrimination). See K.S.A. 38-1624.
[42] 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).
[43] Id. at 467.
[44] 156 F.3d 340 (2nd Cir. 1998).
[45] Supra, note 35.
[46] Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653,32 L.Ed.2d 212, reh. denied, 408 U.S. 931, 92 S.Ct. 2478,33 L.Ed.2d 345 (1972).
[47] Id. at 461.
[48] 382 U.S. 70, 86 S.Ct. 194, 19 L.Ed.2d 889 (1968).
[49] Id. at 78.
[50] Supra, note 46.
[51] Even if a prosecutor would consider POSIT responses in making a charging decision, there would have to be sufficient evidence, independent of the POSIT responses, to establish a basis for charging.
[52] Eastwood v. Dept. of Corrections of State of Oklahoma, 846 F.2d 627
(10th Cir. 1988).
[53] The roots of the right of privacy have been found in the First,Fourth, and Fifth Amendments, in addition to the Bill of Rights and theFourteenth Amendment's concept of personal liberty. Stanley v. George,394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Griswold v.Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Roe v.Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).
[54] Whalen v. Roe, 429 U.S. 589, 598, 97 S.Ct. 869, 51 L.Ed.2d 64
(1977).
[55] Id.
[56] 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).
[57] Id., at footnote 7.
[58] Shane v. Buck, 658 F. Supp. 908 (Utah 1985), affd. 817 F.2d 87
(10th Cir. 1987) (U.S. postal regulation requiring users of mail-receiving agencies to complete a form which identified the postal customer does not violate constitutional right of privacy).
[59] K.S.A. 38-1507(a), 38-1608(e).
[60] The information received from Temporary Lodging for Children indicates that "the POSIT questionnaire and its scores remain in the JIAC with the exception that they are forwarded to JJA for the purpose of back-up to the local JIAC computer system and for research studies of juvenile delinquency and CINC trends at an aggregate level — individual names of youth are not attached to the POSIT search queries."
[61] K.S.A. 38-1618(e).
[62] Prince v. Commonwealth of Mass., 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).
[63] K.S.A. 2000 Supp. 75-7023(d)(1). In Johnson County, juveniles are advised that they do not have to participate in the assessment process, which includes answering the POSIT questions.
[64] Koch Crime Commission General Counsel Division, Juvenile JusticeResearch Project 2, (April, 1996); Koch Crime Commission Juvenile Justice System Task Force, Recommendations on Changes to the Juvenile JusticeSystem in Kansas 9-10, (November, 1995).
[65] Unprotected sexual activity may result in pregnancy or sexually transmitted diseases.
[66] The inquiry into the juvenile's sexual practices is only one of 139 questions that delve into a variety of behaviors.
[67] See Gleeson, Guidelines for Administration of the ProblemOriented Screening Instrument for Teenagers, July, 1995, referred to in the Koch Crime Commission General Counsel Division Report, Juvenile Justice Research Project 6-7 (April, 1996).
[68] Griffin v. Strong, 983 F.2d 1544 (10th Cir. 1993).
[69] Id. at 1547.
[70] "Do your parents/guardians approve of your friends?" "Do your parents/guardians refuse to talk with you when they are mad at you?" "Do your parents/guardians usually know where you are and what you are doing?" "Do your parents/guardians and you do a lot of things together?" "Do your parents/guardians have a pretty good idea of your interests?" "Do your parents/guardians usually agree about how to handle you?" "Does one of your parents/guardians have a steady job?"
[71] Supra, note 68.
[72] 983 F.2d at 1548-1549 (emphasis in original).
[73] Id.
[74] Presumably, it is the effect of the parent's arguing on the juvenile that is of concern rather than the fact that the parents argue.
[75] 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).
[76] Id., 429 U.S. at 605-606.
[77] K.S.A. 38-1507(l); 38-1608(e); 38-1618.
[78] Temporary Lodging for Children has supplied some information regarding use of the information from the POSIT. See Note 60.
[79] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[80] Professor Kobach is a law professor at the University of Missouri-Kansas City.
[81] Id., 392 U.S. at 15.
[82] Id., 392 U.S. at 19 (emphasis added).
[83] Vernonia School District 47J v. Acton, 515 U.S. 646, 652-653,115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).
[84] Examples include where the officer observes a juvenile committing an offense, where the officer has an arrest warrant or has probable cause to believe that a felony or misdemeanor has been committed. If there is probable cause to believe that the juvenile has committed a misdemeanor, the officer may take the juvenile into custody if certain conditions exist.
[85] K.S.A. 38-1624(c).
[86] K.S.A. 2000 Supp. 75-7023(c).
[87] K.S.A. 21-4703(c); K.S.A. 2000 Supp. 21-4711.
[88] Chiles v. State, 245 Kan. 888, 891 (1994).
[89] KPERS v. Reimer Koger Assocs., Inc., 261 Kan. 17, 41 (1996).
[90] Id.
[91] Stephenson v. Sugar Creek Packing, 250 Kan. 768, 774 (1992).
[92] Injured Workers of Kansas v. Franklin, 262 Kan. 840, 847
(1997).
[93] Pauley v. Gross, 1 Kan. App. 2d 736, 742 (1977). See K.S.A.38-101 — 38-108 (limitation on minor's ability to contract and enjoy property rights).
[94] In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527
(1967).
[95] In the Matter of S.A.J., No. 86,008 (Kan. Ct. of App. Sept. 14, 2001) (juvenile has no constitutional right to a speedy trail); Findlayv. State, 235 Kan. 462 (1984) (juvenile has no right to jury trial);Pauley v. Gross, 1 Kan. App. 2d 736, 740-41 (1977) (juvenile has no constitutional right to bail).
[96] In re T.A.L., 28 Kan. App. 2d 396, 399 (2000). See, also, K.S.A.38-1601 ("The primary goal of the juvenile justice code is to promote public safety, hold juvenile offenders accountable for such juvenile's behavior and improve the ability of juveniles to live more productively and responsibly in the community").
[97] 28 Kan. App. 2d 396 (2000).
[98] Id., at 399.
[99] K.S.A. 38-1635.
[100] K.S.A. 22-2908.